Adam J. Levitt (Bar No. 5126602)
**DiCELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com

Alexander E. Barnett (*pro hac vice* forthcoming)
Jarett N. Sena (*pro hac vice* forthcoming)
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel.: (646) 933-1000
abarnett@dicellolevitt.com
jsena@dicellolevitt.com

*Counsel for Plaintiff and the Proposed Class*

[Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Gehring, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| Osaic Holdings, Inc., Osaic, Inc., Osaic Services, Inc., and Osaic Wealth, Inc., | |
| Defendants. | DEMAND FOR JURY TRIAL |

1       Plaintiff Robert Gehring ("Plaintiff"), by his undersigned counsel, individually and on

2  behalf of all members of the below-defined class (the "Class"), brings this action against Osaic

3  Holdings, Inc., Osaic, Inc., Osaic Services, Inc., and Osaic Wealth, Inc. (collectively,

4  "Defendants" or the "Osaic Defendants"), upon personal knowledge as to those allegations

5  concerning Plaintiff and, as to all other matters, upon the investigation of counsel, including,

6  without limitation, review and analysis of: (a) documents created and distributed by Defendants;

7  (b) public filings made by Osaic with the U.S. Securities and Exchange Commission ("SEC"); (c)

8  press releases disseminated by Defendants; and (d) news articles, websites, and other publicly

9  available information concerning Defendants.  Plaintiff believes that substantial additional

10  evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

11  discovery.

12  **I.    INTRODUCTION**

13       1.    This is a class action that arises out of the Osaic Defendants' dramatic under-

14  payment of interest to their own customers in their cash sweeps programs (the "Cash Sweep

15  Programs").  As explained below, the Osaic Defendants have underpaid their customers in

16  violation of their fiduciary duties in order to enrich themselves at their customers' expense.  In

17  engineering the Cash Sweep Programs, the Osaic Defendants continue to breach their fiduciary

18  obligations by putting their own best interests ahead of their clients.

19       2.    In a typical cash sweep program, the uninvested cash balance from a customer's

20  account is transferred into an interest-bearing account that generates returns for the client,

21  consistent with market-based factors.  The Osaic Defendants, however, have structured their Cash

22  Sweep Programs to ensure that they, in partnership with a network of banks and clearing firms,

23  generate the outsized returns for themselves.

24       3.    The Cash Sweep Programs operate as follows.  The Osaic Defendants take money

25  out of their client accounts and give it to a list of selected banks to loan out (the "Program Banks"

26  or "Participating Banks").  The Osaic Defendants and the Program Banks then reap the interest

27  that the banks earn by loaning their clients' money to third parties.  Only a fraction of that interest

28  gets paid out to the Osaic Defendants' actual clients.  Instead, the Osaic Defendants and the

1   Program Banks keep the "spread" or the difference between the market rates of interest the

2   Program Banks earn on their loans and investments and the rates paid out to the clients. This rate

3   of interest Defendants keep for themselves can be as high as ***five to 21 times the rate paid to***

4   ***customers***. Defendants call this scheme the Cash Sweep Programs. While remarkably profitable

5   for Defendants, the Cash Sweep Programs violate common law, federal law, and industry

6   regulations, including Defendants' fiduciary obligations.

7          4.     During the rising interest rate environment from March 2022 through the present,

8   the profits that the Osaic Defendants have earned on their customers' cash have grown

9   exponentially. Rising interest rates should have presented an opportunity for Osaic's customers

10  to earn more on their uninvested cash. However, Defendants continue to exploit this opportunity

11  for their own benefit, extracting the high rates of interest for themselves and thwarting their

12  customers from receiving the reasonable returns they were legally entitled to.

13         5.     Similar cash sweep practices have drawn scrutiny from the SEC and resulted in tens

14  of millions of dollars in fines. According to a January 17, 2025 announcement, the SEC fined

15  Wells Fargo Advisors and Merrill Lynch a combined $60 million for failing to pay advisory

16  customers a fair rate on cash sweeps. Wells Fargo agreed to pay $35 million, including $7 million

17  tied to violations at its independent Financial Network channel. Merrill paid a civil penalty of $25

18  million. As the Osaic Defendants have done, Wells Fargo and Merrill Lynch automatically swept

19  customer cash to a bank deposit program with yields that were as much as 4% lower than

20  reasonable alternatives.

21         6.     Nevertheless, Defendants continue to earn more money on their customers' cash

22  than the customers earn. Defendants disguise the returns they keep as "fees" for administering the

23  Cash Sweep Programs. However, in reality, they receive kickbacks from the Program Banks on

24  the profits they are able to obtain by investing or loaning out customers' cash at significantly higher

25  rates of interest. By improperly keeping the interest rates paid on the cash sweep accounts low

26  and sharing the interest profit with the Program Banks, Defendants continue to align themselves

27  with the banks to maximize their own profits, rather than the customers to which they owe

28  fiduciary duties.

CLASS ACTION COMPLAINT

7.     Plaintiff, individually and on behalf of the other Class members, hereby brings this class action to remedy the significant financial harm caused by the Osaic Defendants' use of the Cash Sweep Programs to enrich themselves at the cost of their own clients.

## II.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005.  There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed $5,000,000, exclusive of interests and costs, and at least one or more members of the proposed Class is a citizen of a different state than at least one Defendant.

9.     The Court has personal jurisdiction and venue over Defendants because the Osaic Defendants have their principal place of business and are headquartered in this District, and regularly transact business here.

10.     Venue is also proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District and because Defendants are subject to the personal jurisdiction of this Court.

## III.     PARTIES

### A.     Plaintiff

11.     Plaintiff Robert Gehring is a citizen of New Hampshire, who maintained accounts at American Portfolios companies and their successor-in-interest Osaic, including an investment advisory individual retirement account ("IRA") and a brokerage account.  The cash balances in Plaintiff's accounts, were at times, automatically "swept" into the Cash Sweep Programs and received yields that were a fraction of reasonable alternatives.

### B.     Defendants

12.     Osaic Holdings, Inc. ("Osaic Holdings") operates as a holding company through which its subsidiaries provide securities and investment advisory services.  Osaic Holdings is owned primarily by a consortium of investors through RCP Artemis Co-Invest, L.P. and RCP Harvest Co-Invest, L.P., investment funds affiliated with Reverence Capital Partners LLC.  The consortium of investors includes RCP Genpar Holdco LLC, RCP Genpar L.P., RCP Opp Fund II

1   GP, L.P., and The Berliniski Family 2006 Trust.  Osaic Holdings is a Delaware corporation with

2   its principal place of business in Scottsdale, Arizona.

3   13.   Osaic, Inc., doing business as Osaic and formerly known as Advisor Group

4   Holdings, Inc. ("Osaic Inc."), a portfolio company of Reverence Capital Partners, is one of the

5   nation's largest providers of wealth management solutions, supporting approximately 11,000

6   financial professionals.  Advisor Group acquired American Portfolios Financial Services in June

7   2022 and changed its name to Osaic in June 2023.  Osaic is a Maryland corporation with its

8   principal place of business in Phoenix, Arizona and a wholly-owned subsidiary of Osaic Holdings.

9   14.   Osaic Services, Inc. ("Osaic Services") is a Delaware corporation with its

10  headquarters in Arizona and is registered with the SEC as a broker-dealer.  Osaic Services also

11  was previously registered with the SEC as an investment adviser from October 2005 until

12  September 29, 2023, when its withdrawal of its registration on Form ADV-W became effective.

13  Osaic Services is a subsidiary of Osaic, Inc., a wholly-owned subsidiary of Osaic Holdings, Inc.

14  15.   Osaic Wealth, Inc. ("Osaic Wealth") is registered with the SEC as a broker-dealer

15  and investment adviser, and is a member of Financial Industry Regulatory Authority ("FINRA").

16  Osaic Wealth is a subsidiary of Osaic, Inc., a wholly-owned subsidiary of Osaic Holdings, Inc.  It

17  is a Delaware corporation with its principal place of business in Scottsdale, Arizona.

18  16.   Osaic Holdings, Osaic, Inc., Osaic Services, and Osaic Wealth are collectively

19  referred to herein as "Osaic."

20  (a)   American Portfolios Holdings, Inc. ("APH") operated as the holding

21  company through which its subsidiaries provided financial services.  It was a Delaware corporation

22  with its principal place of business in Holbrook, New York.

23  (b)   American Portfolio Advisors, Inc. ("APA") was an investment adviser

24  registered with the SEC.  APA offered personalized investment advisory services to individuals,

25  pension and profit-sharing plans, trusts, estates, charitable organizations, corporations, and other

26  business entities.  APA was a wholly-owned subsidiary of American Portfolios Holdings, Inc.  It

27  was a Delaware corporation with its principal place of business in Holbrook, New York.

28

4

1            (c)     American Portfolios Financial Services ("APFS") was a registered broker-

2  dealer that was wholly owned by APH and an affiliate of APA.  APH, APFS, and APA (together,

3  "American Portfolios") were acquired by Osaic on June 22, 2022.  American Portfolios was

4  subsequently integrated and consolidated into Osaic's subsidiary Osaic Wealth.

5  **IV.     FACTUAL BACKGROUND**

6          **A.    Background on Osaic**

7          17.     Osaic is one of the nation's largest providers of wealth management solutions, with

8  approximately 11,600 financial professionals managing more than $653 billion in assets.  During

9  the relevant time period, Osaic offered brokerage and investment advisory services to customers

10  nationwide.  These services included cash sweep programs offered to customers through Osaic's

11  subsidiaries.

12            **1.     Growth and Acquisitions**

13          18.     Osaic's history traces back to SunAmerica Inc., a financial services company

14  founded in Baltimore, Maryland, to assist clients with financial and retirement planning.

15  SunAmerica, Inc. was thereafter acquired by global insurance and financial services firm,

16  American International Group ("AIG"), and then in 2002, AIG Advisor Group was formed.

17          19.     In 2016, Lightyear Capital LLC and PSP Investments acquired AIG Advisor Group

18  and its subsidiaries, including its firms FSC Securities Corp., Royal Alliance Associates Inc.,

19  SagePoint Financial Inc., and Woodbury Financial Service, forming Advisor Group Holdings, Inc.

20  ("Advisor Group").

21          20.     In 2019, Reverence Capital Partners, a private equity firm, announced its

22  acquisition of Advisor Group from Lightyear Capital LLC and PSP Investments for $2.3 billion

23  and a 75% stake.  Lightyear Capital, PSP Investments, and all other shareholders maintained up to

24  a 25% share of Advisor Group.

25          21.     In February 2020, Advisor Group acquired Ladenburg Thalmann Financial

26  ("LTF") to become the second largest broker-dealer in America.  The acquisition included LTF's

27  independent broker-dealer firms: Securities America, Inc., Securities Service Network, LLC,

28  Investacorp, Inc.; Triad Advisors, LLC and KMS Financial Services, Inc.; their affiliated

investment adviser firms Securities America Advisors, Inc., Arbor Point Advisors, LLC, SSN Advisory, Inc., lnvestacorp Advisory Services, Inc., and Triad Hybrid Solutions, LLC; as well as Premier Trust, Inc., Ladenburg Thalmann Asset Management Inc., and Highland Capital Brokerage, Inc.

22.    In May 2022, Advisor Group acquired institution-focused broker-dealer Infinex Financial Holdings.

23.    In June 2022, Advisor Group continued its strategic growth with the acquisition of American Portfolios Financial Services, an independent brokerage and registered investment adviser supporting more than 850 financial professionals in nearly 400 branches across the country.

### 2.    Consolidation and Integration

24.    In June 2023, Advisor Group announced its new name Osaic as part of a multi-month strategy to rebrand its subsidiary firms into one cohesive entity.

25.    As part of the rebrand, each of the wealth management firms previously under Advisor Group transitioned into Osaic beginning in the fall of 2023.  By October 2024, Dimple Shah, Osaic's Head of Advisor Growth and Platform Solutions, reported that 90% of its consolidation process, which Osaic calls its "Journey to One," had been complete.  The firms acquired by Osaic have been integrated and consolidated into Osaic's various subsidiaries.  For instance, APA has been integrated into Osaic Wealth.

26.    By bringing all eight of its wealth management firms together under one brand, Osaic stated it "will be better positioned to serve its financial professionals by offering them access to the full breadth of capabilities and expertise that the firm's growing scale provides."

### B.    Defendants' Duties to Their Clients

#### 1.    Defendants Acting as Investment Advisers Owe Fiduciary Duties to Their Clients

27.    Osaic offers investment advisory services to retail or individual customers through its subsidiaries, including Osaic Wealth, Inc., which are SEC-registered investment advisers.

28.    Osaic Wealth is registered as an investment adviser with the SEC, SEC File No. 801-54859, in order to offer investment advisory products and services to its advisory clients.

29.    APA was also registered with the SEC File No. 801-61065 while it was providing investment advice to Plaintiff, until Osaic acquired it.

30.    Under the Investment Advisers Act of 1940 (the "Advisers Act" or the "1940 Act"), Osaic Wealth and APA owed fiduciary duties to Plaintiff and the proposed class, as Osaic acknowledges:

> When providing advisory services, ***we are held to a fiduciary standard that covers our investment advisory relationship with you***.  As fiduciaries, investment advisors are required to act in the best interest of their clients and not place their own interests ahead of their clients.[1]

31.    Osaic manages investment advisory accounts on either a discretionary or non-discretionary basis, which are subject to the Cash Sweep Programs.  In providing discretionary advisory services, Osaic makes the decision regarding the purchase or sale of investments without the client's approval as to each transaction.  In contrast, when providing non-discretionary services, Osaic, "may recommend investments for your account, but the ultimate decisions regarding what you buy or sell are yours."

32.    Investment advisers such as Osaic are fiduciaries under the 1940 Act.  *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also* Securities and Exchange Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Securities Act Release No. 5248, Investment Company Act No. 5248, 2019 WL 3779889, at *1 (June 5, 2019) ("Under federal law, an investment adviser is a fiduciary.").

33.    The investment adviser's fiduciary duty "is broad and applies to the entire adviser-client relationship."  This fiduciary duty is "based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act."  *Id.* at *2.

---

[1] Form CRS: Customer Relationship Summary, OSAIC (2023), https://files.brokercheck.finra.org/crs_23131.pdf.  All emphasis is added unless otherwise stated.

34.    The fiduciary duty an investment adviser owes to its client under the 1940 Act specifically encompasses a duty of care and duty of loyalty.

35.    As the SEC has stated, "[t]his means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own.  In other words, the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at *3.

36.    Under an investment adviser's duty of loyalty, "an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict."  If there is a conflict, an investment adviser "must make full and fair disclosure to its clients of all material facts relating to the advisory relationship." *Id.* at *3, *8.

37.    The investment adviser's duty of care includes among other things: "(i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship." *Id.* at *4.

### 2.    Defendants as Broker-Dealers Owe Duties to Act in the Best Interests of Their Clients

38.    Industry rules for registered broker-dealers impose duties on Defendants in their capacities as broker-dealers, including a duty to act in the best interests of their clients, and to place the best interests of their customers ahead of their own self-interest.  Osaic Wealth acknowledges these important duties it owes its clients in providing both brokerage its Form Client Relationship Summary ("Form CRS"):

***Brokerage Services***

\*      \*      \*

One of our obligations to you when providing brokerage services is that ***we must act in your best interest and not place our interests ahead of yours when we recommend an investment or an investment strategy involving securities***.

1
2
> Additionally, when we provide any service to you, we must treat you fairly and
> comply with a number of specific obligations.

3
When Osaic "provide[s] you [the customer] with a recommendation as your broker-dealer or act

4
as your investment advisor, [Osaic] ha[s] to act in your best interest and not put our interest ahead

5
of yours."

6
     39.    Similar duties are imposed on Osaic under broker-dealer law.  Assuming that Osaic

7
is not acting as an investment adviser but instead in its capacity as a broker-dealer, Osaic is still

8
obligated to act in its clients' best interests under Regulation Best Interest: The Broker-Dealer

9
Standard of Conduct, 84 Fed. Reg. 33381-01 (July 12, 2014) ("Reg. BI").  *See* 17 C.F.R. §240.151-

10
1.

11
     40.    Although the specific application of Reg. BI and the fiduciary standard under the

12
1940 Act may differ in some respects, "they generally yield substantially similar results in terms

13
of the ultimate responsibilities owed to retail investors."[2]

14
     41.    Under Reg. BI, "a broker-dealer must act in the retail customer's best interest and

15
cannot place its own interests ahead of the customer's interests" when making a recommendation.

16
84 Fed. Reg. at 33320.

17
18
### 3. Defendants' Duties to Secure a Reasonable Rate of Interest in IRA Accounts

19
     42.    Defendants also have a duty to secure a reasonable rate of interest for clients'

20
uninvested cash.  The requirement to pay a reasonable rate of interest derives from the Internal

21
Revenue Code ("IRC").

22
     43.    Section 4975 of the IRC – entitled "Tax on prohibited transactions" – applies to

23
Osaic and APFS's IRA accounts, including Plaintiff's.  *See* 26 U.S.C. §4975(e)(1)(B) (defining

24
"plan" for purposes of this section to include "an individual retirement account described in [IRC]

25
section 408(a)").

26
27
---

[2] *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers
Care Obligations, SEC (last updated Apr. 30, 2024), www.sec.gov/tm/standards-conduct-broker-

28
dealers-and-investment-advisers.

44.     "Prohibited transactions" under IRC §4975 are defined to include when an IRA plan sponsor engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account."  26 U.S.C. §4975(c)(1)(E).  IRC §4975 also prohibits transactions that involve a "transfer to, or use by or for the benefit of, a disqualified person of the income or assets" or "receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan."  26 U.S.C. §4975(c)(E)-(F).

45.     To provide further clarification on distributions of IRAs, the U.S. Internal Revenue Service ("IRS") explains in Publication 590 that "[g]enerally, a prohibited transaction is any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."

46.     A "disqualified person" includes those "providing services to the plan."  26 U.S.C. §4975(e)(2)(B).  This includes financial institutions that hold client assets and advisory firms that determine which bank will hold those assets, such as Osaic and APA.  As IRS Publication 590 explains, "[d]isqualified persons include your fiduciary," such as anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets."

47.     Therefore, under the IRC, the Osaic Defendants were "disqualified person[s]" and cash sweeps from IRA accounts were "prohibited transactions."

48.     IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions."   One safe harbor to the taxation of prohibited transactions is "the investment of all or part of a plan's assets in deposits *which bear a reasonable interest rate* in a bank or similar financial institution."  26 U.S.C. §4975(d)(4).

49.     These provisions explicitly target situations where a firm might attempt to benefit from holding its client funds by paying them unreasonably low interest rates, and instead requires that the firm pay a "reasonable rate of interest."  *See McLaughlin v. Rowley*, 698 F. Supp. 1333, 1339 (N.D. Tex. 1988) (holding the reasonable rate of interest requirement under subsection (D)

1  of the exemption imposed "***an obligation to charge a reasonable rate of interest in light of the***

2  ***prevailing or market rates then existing***").

3       50.    The U.S. Treasury regulations include a similar requirement where financial

4  institutions such as Osaic and APFS "invest[] plan assets in deposits in itself or its affiliates."  26

5  C.F.R. §54.4975-6(b)(3)(i).  In such circumstances, the parties' agreement "must name" the bank

6  and "***must state*** that such bank or similar financial institution may make investments in deposits

7  which ***bear a reasonable rate of interest*** in itself (or in an affiliate)."  *Id.*

8       51.    Section 408 of Employee Retirement Income Security Act of 1974 ("ERISA")

9  similarly exempts interested party transactions involving the investment of IRA assets in bank

10  deposits only if they "bear a reasonable rate of interest."  *See* 29 U.S.C. §1108(b)(1)(D).  The

11  statutory exemptions under ERISA and the IRC are effectively the same, except that the IRC

12  provisions substitute the term "disqualified person" for the term "party in interest."

13       52.    In sum, federal law requires that the Osaic Defendants pay their clients a

14  "reasonable" interest rate.  Defendants violated those laws by failing to pay reasonable sweep

15  interest rates.

16
17            **4.    The Defendants Were Contractually Obligated to Act in the
                       Clients' Best Interest and Pay a Reasonable Rate of Interest**

18       53.    Upon opening a new account with Osaic, each customer is provided with

19  standardized contractual documents, which expressly incorporate the same Osaic Cash Sweep

20  Program Documents (the "Account Agreements").  Pursuant to the Account Agreements and the

21  Osaic Cash Sweep Programs, Osaic's customers agreed "to having [their] account, and all

22  subsequent and future account(s) opened for [them] by [Osaic], be automatically included in the

23  Sweep Program."

24       54.    The Osaic Defendants' contractual agreements also reinforce their obligation to

25  provide reasonable rates of return on their customers' cash balances.  The Osaic Defendants

26  specifically recognize in their "Fiduciary Acknowledgement" for IRAs that when they provide

27  investment advice to IRA accountholders, they are fiduciaries under applicable laws:

28

<u>American Portfolios</u>
*Fiduciary Acknowledgement*
When American Portfolios provides investment advice, as defined by the Department of Labor, to you regarding your retirement plan account or individual retirement account (IRA) under ERISA, ***American Portfolios is a fiduciary within the meaning of Title I of the Employee Retirement Income Security Act and/or the Internal Revenue Code, as applicable, which are laws governing retirement accounts***.

<u>Osaic</u>
*Fiduciary Acknowledgment*
When the Firm and your financial professional provide "investment advice" within the meaning of Title 1 of the Employee Retirement Income Security Act and/or the Internal Revenue Code ("Retirement Laws") to you regarding your retirement plan account or individual retirement account ("Retirement Account(s)"), ***we are fiduciaries under the Retirement Laws with respect to such investment advice***.[3]

55.    The Osaic Defendants add that with respect to IRAs "[t]he way we make money creates certain conflicts with your interest, "***so we operate under a special rule that requires us to act in your best interest and not put our interests ahead of yours***."  Under these requirements, Osaic provides that it must:

- Meet a professional standard of care (give prudent advice);

- Not put our financial interests ahead of yours;

- Avoid misleading statements about our conflicts of interest, fees, and investments;

- Follow policies and procedures designed to ensure that we give advice that is in your best interest;

- Charge no more than what is reasonable for our services; and

- Give you basic information about our conflicts of interest.

---

[3] *See* IRA Rollover Guide, Osaic, https://osaic.com/disclosures/ira-rollover-guide (last visited Jan. 27, 2025).

### 5.    The Osaic Defendants' Code of Conduct

56.    The Osaic Defendants' fiduciary duties to their customers are further reflected in their Code of Ethics (the "Code").[4]   The Osaic Defendants were required to adopt the Code pursuant to Rule 204-1 of the 1940 Act, which "set[s] forth standards of conduct and require[s] compliance with federal securities laws."

57.    As Osaic acknowledges, it adopted the Code because "[t]he Firm has a fiduciary obligation to [its] clients."   The Code "is intended to reflect and identify the fiduciary principles of honesty, integrity, and fairness that are to be consistently applied across the RIA firms and their dealings with clients."

58.    The Code states that the "*[c]lients' interests must always come first*; they cannot be compromised."

59.    Under the section titled "Our Fiduciary Obligation to Our Clients," the Code explains:

> Fiduciary responsibility should be thought of as the duty to place the interests of the Client before that of the person providing investment advice.   Failure to do so may render the Firm or its Supervised Persons in violation of the anti- fraud provisions of the Advisers Act.

60.    Further, Osaic "as a fiduciary, has an affirmative duty of care, loyalty, honesty, and good faith to act in the best interests of its Clients."   This fiduciary responsibility "also includes the duty to disclose material facts that might influence the Client's decision to purchase or refrain from purchasing a security recommended by the Firm or from engaging the Firm to manage the Client's investments."

### C.    Defendants' Cash Sweep Programs

61.    In a typical cash sweep account for an investment advisory account customer, the firm moves uninvested cash (*e.g.*, incoming cash deposits, dividends, or certain investment returns) from the customer's account to a money market mutual fund or a bank whose deposits are insured

---

[4] *See* Code of Ethics, OSAIC (Aug 30, 2024),
https://assets.osaic.com/m/5b81d3e5600ea3e1/original/Code-of-Ethics.pdf.

1    by the Federal Deposit Insurance Corporation ("FDIC").  Cash sweep accounts are intended to

2    convert idle cash into interest-bearing investment vehicles.

3                    **1.      The AP Cash Sweep Program**

4        62.     Prior to the acquisition by Osaic, American Portfolios operated a cash sweep

5    program (the "AP Cash Sweep Program") through its affiliated broker-dealer APFS, whereby

6    uninvested cash balances were automatically swept into FDIC deposit accounts at multiple banks,

7    also known as the Participating Banks.

8        63.     The terms and conditions of the AP Cash Sweep Program were set forth in

9    "American Portfolios FDIC Insured Bank Deposit Program Disclosure Statement" (the "AP Cash

10   Sweep Document"), which was posted on American Portfolio's website.

11       64.     As the AP Cash Sweep Document provides, uninvested cash balances were

12   automatically swept into the AP Cash Sweep Program by a matter of default upon the opening of

13   customers' accounts:

14                   Upon opening your Account, your Account will automatically have
                     the Bank Deposit Sweep Program established as the default cash
15                   sweep option.

16

17       65.     Pershing LLC ("Pershing") acted as the "authorized agent" under the AP Cash

18   Sweep Program to "establish and maintain Deposit Accounts at various Participating Banks and

19   to effect deposits to, withdrawals from and transfers between the deposit accounts at the various

20   Participating Banks."

21       66.     APFS exercised control and discretion over the eligibility, terms, and conditions,

22   as well as the parameters and characteristics of the AP Cash Sweep Program, including changing,

23   modifying or deleting aspects of the program:

24                   Upon prior notice, APFS may change, add or delete the sweep
                     options available in your Account, or the terms and conditions of its
25                   Bank Deposit Sweep Program.  Furthermore, APFS may, upon prior
                     notice to you, change the sweep option in which you participate
26                   from one option to another, including changes between money
                     market funds and bank deposit sweep programs.
27

28

**CLASS ACTION COMPLAINT**

67.     After Osaic's acquisition of American Portfolios, the AP Cash Sweep Program continued until APA and APFS were integrated into Osaic, at which point the AP Cash Sweep Program was subsumed by the Osaic Cash Sweep Programs.

**D.    Osaic's Cash Sweep Program**

68.     Under Osaic's Cash Sweep Programs, "cash balances . . . [are] transferred to a bank deposit sweep product, which allocates swept balances to participant banks whose deposits are insured by the Federal Deposit Insurance Corporation ('FDIC') up to allowable limits and subject to certain conditions" (the "Osaic Cash Sweep Programs," and together with the AP Cash Sweep Program, the "Cash Sweep Programs").

69.     Osaic refers to the uninvested cash eligible to be swept as "Free Credit Balance," *i.e.*, the credit balance that remains in a client's account "after all purchases are made and are free from withdrawal restrictions."   A customer's free credit balance "generally originates from dividends, interest payments, and/ or security sales and may be used at any time to purchase more securities."

70.     Osaic, through its affiliated broker-dealer, offers cash sweep programs for accounts introduced to their two respective clearing firms: (1) Pershing and (2) National Financial Services LLC ("NFS").  Pershing and NFS (the "Clearing Firms") act as the customers' agents with respect to the programs.  The Clearing Firms, respectively, are responsible for establishing the Deposit Accounts at each Program Bank, depositing cash into the Deposit Accounts, withdrawing cash from Deposit Accounts, and transferring cash between Deposit Accounts.

71.     The clearing firm for the Osaic Cash Sweep Programs are selected based on where the customer's investment account is maintained.  As with the AP Cash Sweep Program, Pershing is appointed as the clearing firm for: "accounts introduced to" Pershing.  Whereas NFS is appointed as the clearing firm for accounts "introduced by [Osaic] to and held by . . . NFS."

72.     Osaic published two disclosure document for accounts introduced at NFS and Pershing, respectively: (1) "Sweep Program Disclosure Document: For accounts introduced to National Financial Services LLC" (the "NFS Cash Sweep Document") and (2) the "Sweep Program Disclosure Document: Pershing, LLC" (the "Pershing Cash Sweep Document," and

1    together with the NFS Cash Sweep Document and the AP Cash Sweep Document, the "Cash

2    Sweep Program Documents.")  The Cash Sweep Program Documents are incorporated into Osaic's

3    contractual agreements.

4        73.    Regardless of the clearing firm selected by Osaic, "free credit balances" were

5    automatically swept pursuant to two deposit programs: (1) the Bank Deposit Sweep Program

6    ("BDSP") and (2) the Insured Cash Account Program ("ICAP").

7        74.    The BDSP has broad applicability.  The BDSP operates as the "default" cash sweep

8    program for "[a]ll advisory and commission-based retail account types, and commission-based

9    IRA's."  The BDSP includes investment advisory accounts where the Osaic Defendants owed

10   fiduciary duties to their clients under the 1940 Act.

11       75.    The Insured Cash Account Program is the default cash sweep program for all

12   advisory, fee-based IRA accounts ("Advisory IRAs").  Eligibility for ICAP is limited to Advisory

13   IRA accounts, where an "advisory fee is charged" by Osaic or an affiliated investment adviser.

14   Thus, the eligibility criteria for ICAP triggers Osaic's strict fiduciary duties as an investment

15   adviser under the 1940 Act.

16       76.    Despite different eligibility criteria, the BDSP and ICAP programs function largely

17   the same.  Pershing or NFS, as authorized agents, sweep the free credit balances into deposit

18   accounts with one or more Program Banks listed on the applicable program bank list ("Program

19   Bank List").  Like the Participating Banks under the AP Cash Sweep Program, the Program Banks

20   are a network of banks selected by Defendants where cash gets swept into.

21       77.    The Program Bank List is updated from time to time and all changes are "posted to

22   the website listed in Appendix A, along with the date on which the most recent update was made."

23   As the Cash Sweep Program Documents provide, one or more of the Program Banks "may be

24   replaced" or "deleted" or the order of Program Banks on the Program Bank List may change at

25   any time by the Osaic Defendants.  As with the AP Cash Sweep Program, a "nondiscretionary"

26   methodology is purportedly used to determine how swept cash is allocated to each Program Bank

27   subject to "deposit capacity limits."

28

CLASS ACTION COMPLAINT

78.     While Pershing or NFS acted as the respective agent, the Osaic Defendants, and to an extent the Clearing Firms, exercised control and discretion over eligibility and the characteristics and parameters of the Cash Sweep Programs, including making any changes or modifications.  As the NFS Cash Sweep Disclosure states, "[e]ligibility for the BDSP is subject to the other limitations described herein and as determined by us and NFS."  Osaic and NFS also "retain the right to modify the eligibility for the BDS and ICAP and" "make changes" to the Program List "at any time."  Osaic and NFS further provide that circumstances, "***will require*** that we or NFS make certain modifications or changes to the Cash Sweep Program, including changing the core account investment vehicles."

79.     Osaic, rather than the Clearing Firms, has the sole authority to set the fees and rates of interest.  Osaic specifically had the control and discretion to: (1) "establish and change interest rates" set by the Program Banks; (2) "determine the tier levels (if applicable) at which interest rates are paid"; and (3) determine "the amount of fees received by [the Clearing Firms], Osaic Wealth, and any other service provider."[5]  The Cash Sweep Agreements make clear that: "***we [Osaic] determine the rate of interest you receive on your Deposit Accounts***."  The Form ADV further provides that: "[t]he interest rate payable to you [the customer] is determined by us [Osaic]."

80.     The rate is purportedly set by Osaic's Cash Review Committee, which considers a number of market-based factors:

> Our Cash Review Committee meets periodically to review the interest rates paid to clients in the [Bank Deposit Sweep Program] and determine whether and when the rates will change.  Factors considered include the rates paid by Program Banks [to obtain deposits from the Sweep Program], expected changes in interest rates, interest rates paid by market competitors, and program expenses.

---

[5] Osaic Wealth, Inc., Form ADV Part 2A (Jan. 24, 2025), https://assets.osaic.com/m/2e9b66b68b4df36c/original/Form-ADV-Part-2A.pdf ("Form ADV").

81.     Due to applicable law, industry standards and the Osaic Defendants' control and discretion over investors' cash sweep holdings and the returns on such holdings, the Osaic Defendants owe a fiduciary duty to all of their customers with cash in sweep accounts, which includes a duty to act in their best interests, and to place such best interests ahead of their own self-interest. Defendants breached that fiduciary duty when they swept client cash into Cash Sweep Programs vehicles that paid customers unreasonably low interest rates.

### E.     Defendants Breached Their Fiduciary Duties

82.     The Osaic Defendants breached and continue to breach their duties to secure reasonable interest rates for their clients' deposits, because the interest paid on their clients' cash deposits and the so-called "fee" extracted for themselves was and is not reasonable.

83.     Prior to the acquisition by Osaic, the interest rates paid by American Portfolios under the AP Cash Sweep Program were as low as 0.01% in 2022 – virtually nothing.

84.     After the APA acquisition, Defendants continued to pay their clients paltry rates of interest that were exceedingly lower than market-based indicators.

85.     Below is a chart of the interest rates paid in Osaic's Bank Deposit Sweep Program as of January 17, 2025, which is based on the amount of assets deposited in accounts custodied by Pershing and NFS:

| Tiers | Deposit Range | Rate |
|-------|---------------|------|
| 1 | $0 – $24,999 | .15% |
| 2 | $25,000 – $49,999 | .15% |
| 3 | $50,000 – $99,999 | .15% |
| 4 | $100,000 – $249,999 | .20% |
| 5 | $250,000 – $499,999 | .30% |
| 6 | $500,000 – $749,999 | .40% |
| 7 | $750,000 – $999,999 | .75% |
| 8 | $1,000,000 – $1,499,999 | 1.00% |
| 9 | $1,500,000 – $4,999,999 | 1.25% |
| 10 | $5,000,000 – MAX | 1.50% |

CLASS ACTION COMPLAINT

86.     Below is a chart of the interest rates paid in Osaic's Insured Cash Account Program in accounts custodied by Pershing and NFS, respectively:

NFS

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/ fee-based IRAs accounts | .65% | $19.60 |

Pershing

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/fee-based IRAs accounts | 0.60% | $23.30 |

87.     As set forth above, for customers with up to $999,999 in assets at Osaic, Osaic is currently paying as little as 0.15% in interest, and only up to 1.5%.

88.     As explained below, the rates paid by Osaic were unreasonable even in a low interest rate environment and were far less rates offered by competing sweep accounts.

89.     Moreover, the rates of interest paid to Osaic customers were net of "fees" or the rates of interest paid by the Program Banks to the Osaic Defendants and the Clearing Firms.  These "fees" that the Defendants reaped off of their clients' cash were significantly higher than the rate of interest paid to those clients.

90.     An interest rate is reasonable if it is based on a fair market valuation.  As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

91.     The U.S. Department of Labor defines a "reasonable" rate of interest as:

a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

CLASS ACTION COMPLAINT

92.    Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."

93.    Thus, under these terms, and any fair interpretation of what a "reasonable" rate of interest is, Defendants have not secured or paid a reasonable rate of interest to their customers, including Plaintiff and the Class.  The Cash Sweep Programs have paid well below the prevailing or market interest rates.

94.    Defendants' rates of interest in the Cash Sweep Programs were also below objectives measures of reasonableness, including the leading indicators set forth below.  These benchmarks demonstrate that the rates of interest in the Cash Sweep Programs were unreasonable. As a result, Plaintiff and the Class suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable.

### 1.    The Federal Funds Rate

95.    The federal funds market consists of domestic unsecured borrowings in U.S. dollars by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises.  In other words, the Federal Funds Rate is the interest rate charged by banks to borrow from each other overnight.  The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions (the "Federal Funds Rate").

96.    From 2018 to 2019, and again from March 2022 to August 2024, the Federal Reserve began significantly raising the effective federal funds rate.

97.    By August 2024, the effective Federal Funds Rate had risen to 5.33%.  As the chart below shows, while the Federal Reserve began raising the federal rate beginning in 2018 through 2024 – up from 0.08% in February 2022 to 5.33% in August 2024 – Defendants kept the interest paid to Osaic cash sweep account holders drastically lower:

1
2
3
4
5
6
7
8
9
10
11
12



13    98.    While the Federal Funds Rate has declined moderately since the summer of 2024,

14 it is still hovering above 4.40% – significantly above the rates of interest paid by Defendants to

15 their clients under the Cash Sweep Programs.

16    **2.    Interest on Short-Term U.S. Treasury Bills**

17    99.    The yield on short-term U.S. Treasury Bills further demonstrates that the rates

18 Osaic paid on the Cash Sweep Programs were unreasonably low.  U.S. Treasury Bills ("T-Bills")

19 are short-term securities issued by the U.S. Department of the Treasury with maturities ranging

20 from four to 52 weeks.  T-Bills are issued at a discount from the face value, and when they mature,

21 the investor is paid the face value.

22    100.    Treasury Bills are considered safe investments because they are backed by the U.S.

23 government, but generally carry low rates of return.  Nevertheless, the yield on the shortest term

24 (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately

25 5.5% in mid-2023.  Currently, as of December 31, 2024, the one-month treasury rate was set at

26 4.42% and the three-month rate at 4.309%.

27    101.    By contrast, the interest rate Osaic paid under the Cash Sweep Programs has

28 remained a fraction of the T-Bill rate.

1

### 3. Money Market Rates, Including Those Offered by Osaic

2      102.    Money market rates are another benchmark for determining a reasonable rate of

3   interest.

4      103.    Money market funds are a type of mutual fund that invests in high-quality, short-

5   term debt instruments and cash equivalents, such as U.S. Treasury Bills.

6      104.    The rate of return for a money market mutual fund is typically shown for a seven-

7   day period, referred to as the "7-day yield," and is typically expressed as an annual percentage

8   rate.

9      105.    Outside of the Cash Sweep Programs, Osaic offered money market mutual funds

10   through accounts custodied at both Pershing and NFS (the "Money Market Funds").  However,

11   the Money Market Funds were only the default product or "available for use as a core account

12   investment vehicle" for a very narrow set of account types not held by many individual investors:

13   ERISA Title I accounts, 403(b)(7) plans, and Keogh Plans.

14      106.    Osaic's Money Market Funds offered significantly higher rates of interest than what

15   it paid to investors under the Cash Sweep Programs.  For example, the Federated Hermes

16   Government Reserves Fund for Osaic accounts custodied at Pershing currently provides a 7-day

17   yield of 3.43% and the Fidelity Government Cash Reserves Fund for Osaic accounts custodied at

18   NFS provides a yield of 4.19%.

19      ### 4. Other Institutions' Cash Sweep Account Interest Rates

20      107.    The sweep interest rates paid by Osaic's competitors, who offered FDIC-insured

21   sweep accounts similar to those in the Osaic Cash Sweep Programs, demonstrate that the rates

22   offered by Defendants were unreasonably low.

23      108.    For example, as the Federal Reserve raised the Federal Fund Rate, Fidelity

24   Investments and R.W. Baird increased the rates of interest they pay to customers from 2022 to

25   2024, offering significantly higher rates than Osaic for similar cash sweep programs.

26      109.    Currently, competitor Moomoo Financial Inc.'s rate for cash swept is 4.1%,

27   Webull's rate is 3.75%, Vanguard's rate is 3.65%, Fidelity's rate is 2.19%, and Robert W. Baird's

28   rate is between 1.45% and 2.89%.  Osaic is paying as little as 0.15%.

110.    As these competitor rates show, other brokerage and advisory financial institutions that have cash sweep programs pay or secure significantly higher interest rates than Osaic.

### 5.    The Interest Rate Applicable to Short-term Instruments, Such as Repurchase Agreements

111.    A repurchase agreement ("repo") is a short-term secured loan, where one party sells securities to another and agrees to repurchase those securities later at a higher price.  In simple terms, a repo is an exchange of a security (which acts as collateral) for cash.

112.    Banks, dealers, other financial institutions, and corporate investors commonly use repos to finance their securities inventories, obtain short-term funding, and/or meet regulatory requirements.  Typically, high-quality debt securities are used as the collateral in a repo, such as government bonds, agency bonds, supranational bonds, corporate bonds, convertible bonds, and emerging market bonds.

113.    The U.S. overnight repo rate, set by the Federal Reserve, represents the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs. From April of 2023 through April of 2024, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to high of 5.55% in December 2023.  Currently, the U.S. overnight repo rate is 4.25% as of January 8, 2025, which is significantly above the interest rate paid by Defendants to account holders in the Cash Sweep Programs.

### F.    The Cash Sweep Program Unfairly Benefits the Osaic Defendants

114.    The Osaic Defendants have intentionally structured the Cash Sweep Programs with the Program Banks for their own financial benefits, to the detriment of Osaic's clients, by keeping the interest rates for their cash sweep accounts artificially low, while earning higher interest rates on those deposits in the form of "fees" paid by the Program Banks.

115.    First, the Program Banks benefit from the "significant amount of cash" the Osaic Defendants make available to them through the Cash Sweep Program, which is "***generally in the billions of dollars***."  This massive cash in-flow provides the Program Banks with a "relatively stable source of deposits."  Program Banks in turn use the deposited cash for their investment or lending activities, thus driving substantial revenue for the Program Banks.

116.    Second, the Osaic Defendants profit from the "spread," a significant portion of which they continue to keep for themselves, at the expense of their customers, as "fees" charged for the Cash Sweep Programs.  Osaic, NFS, Pershing, and the third-party administrator all share in the "fees" or "income" paid by the Program Banks.  These fees are "***net of," and reduce the interest paid on customers' cash balances*** in the Cash Sweep Program.

117.    As Osaic acknowledges in its Form ADV, "[b]ecause the Sweep Program generates significant payments from third parties (*i.e.*, the Program Banks that participate in BDSP and/or ICAP) to [Osaic's affiliated broker-dealers], a conflict of interest exists."

118.    The conflict of interest is exemplified by the significant profits the Osaic Defendants are able to generate from the Cash Sweep Programs in comparison to other types of products.  While the Osaic Defendants profit from "fees" paid by the Program Banks under the Cash Sweep Programs, they do not receive any fees from the Money Market Funds.  This helps explain why the Cash Sweep Programs, and not the Money Market Funds or other higher interest-bearing products were the default option for many Osaic accountholders.

119.    A conflict of interest further arises for advisory accounts, because Osaic "earn[s] more compensation from cash balances being swept to or maintained in the Sweep Program than if you purchase other investment funds or securities."  *See* Form ADV at 27.  As to Advisory IRA Accounts and other investment advisory accounts, Osaic earned two layers of fees on the same cash balances: compensation from the Cash Sweep Programs ***and*** advisory fees paid to Osaic's affiliated investment adviser.  Unfortunately, this incentivizes the Osaic Defendants to keep their clients' cash idle, because they make more money through the Cash Sweep Programs than fulfilling their fiduciary duties to invest that cash in the markets on behalf of their clients.

120.    The "fees" that Defendants collect under the Cash Sweep Programs are, in effect, profit shared by the Program Banks.  While the structure of the "fees" vary based on the type of Cash Sweep Program, the end result is the same: Defendants profit from the difference in rates of interest, at the expense of their customers.  Defendants also receive additional compensation from "Priority Banks," *i.e.*, Program Banks placed ahead of other Program Banks, because they have

1  "agreed to pay additional compensation to [Osaic] to receive preferential ordering in the allocation

2  sequence."

3         **1.**      **Defendants' Profits Under the Bank Deposit Sweep Program**

4       121.    For the Bank Deposit Sweep Program, the fee that Defendants receive is based on

5  the "spread" or the difference between the interest paid out to the Osaic clients and the rate earned

6  by the Program Banks on their investment activities (the "BDSP Fee").  This spread is also known

7  as net interest income.  The Cash Sweep Program Documents provide:

8              The Program Banks thus have an incentive to pay a rate for Program
   Deposits that is higher than the rate received by you, and the
9              ***difference is the fee we [Osaic] and NFS collect for administering***
   ***the Sweep Program and related services***.
10

11                               *        *        *

12              For the BDSP, ***the difference between the rate paid*** by a Program
    Bank and the rate you receive as interest ***is the total fee that we,***
13              ***Pershing, and the third-party administrator collect for***
    ***administering the BDSP and related services***.
14

15       122.    Defendants' BDSP Fee is paid by the Program Banks for "provid[ing] . . . a

16  significant source of steady deposits."  The payment is "equal to a percentage of ***all*** participants'

17  average daily deposits at all Program Banks."

18       123.    Because Defendants received the difference between the interest rate paid to the

19  client and the rate secured by the Program Banks, they continue to align themselves with the

20  Program Banks, rather than the customers to which they owed fiduciary duties.  The greater the

21  difference between the interest secured by the Program Banks and interest paid to the Osaic clients,

22  the greater the profit for the Osaic Defendants.

23       124.    Indeed, the interest rate that Osaic earned as its "BDSP Fee" on its clients' cash

24  was, at all relevant times, ***significantly above*** the rates of interest paid out to those clients:

25

26

27

28

CLASS ACTION COMPLAINT

Pershing:

| Year | Quarter | BDSP Fee* |
|------|---------|-----------|
| 2024 | **Q3** | 3.87% |
|      | Q2 | 4.19% |
|      | Q1 | 4.27% |
| 2023 | Q4 | 4.08% |
|      | Q3 | 4.17% |
|      | Q2 | 3.95% |
|      | Q1 | 3.36% |
| 2022 | Q4 | 1.85% |
|      | Q3 | 1.79% |
|      | Q2 | 0.59% |
|      | Q1 | 0.18% |

NFS:

| Year | Quarter | BDSP Fee* |
|------|---------|-----------|
| 2024 | Q3 | 4.33% |
|      | Q2 | 3.65% |
|      | Q1 | 3.65% |
| 2023 | Q4 | 3.44% |
|      | Q3 | 3.59% |
|      | Q2 | 3.35% |
|      | Q1 | 3.03% |
| 2022 | Q4 | 1.44% |
|      | Q3 | 1.28% |
|      | Q2 | 0.48% |
|      | Q1 | 0.29% |

125.    To put this in perspective, customers who deposited their cash under the Cash Sweep Program received only 0.20% to 0.75% in interest for assets below one million as November 25, 2024. By contrast, Defendants received a BDSP Fee equal to a rate of interest of 4.33% in in the third quarter of 2024 – *five to 21 times the rate paid to its customers*.

1    126.    Osaic Defendants knew that their customers in the Cash Sweep Program received

2    artificially depressed rates of interest, as low as 0.15%, and yet, purposefully designed the Cash

3    Sweep Programs to maximize the returns they received, at the expense of their clients.   For

4    instance, Osaic Defendants set the maximum rate of interest they could receive as their BDSP Fee

5    as high as 600 basis points or 6.00% per year (the Maximum Fee).

6
              **2.      Defendants' Profits Under the AP Cash Sweep Program and**
7                     **Insured Cash Account Program**

8    127.    Osaic Defendants structured the fees they received under the Insured Cash Account

9    Program functionally the same as those previously generated by American Portfolios under the AP

10   Cash Sweep Program.   Both American Portfolios and its successor-in-interest Osaic Defendants

11   received or receive "monthly per account fees" from the Program Banks for administering the

12   programs.

13   128.    Under the AP Cash Sweep Program, APFS was "paid a maximum monthly per

14   account fee of $22.50 for its services in connection with maintaining and administering the

15   program."  This fee was "paid to APFS by the Participating Banks" (the "AP Fee").

16   129.    Under the Insured Cash Account Program, Defendants charge a "monthly fee for

17   each Advisory IRA Account that participates in the ICAP" ("the ICAP Fee.")  The monthly fee is

18   a fixed dollar amount that "does not vary by the actual amount of cash in a particular account,"

19   thereby creating a conflict of interest between "clients with larger cash balances and clients with

20   smaller cash balances."   In contrast to AP Cash Sweep Program, Osaic never capped their per

21   account fee at a maximum amount, allowing it to earn unlimited interest based on the Federal Fund

22   Rate.

23   130.    Despite Osaic and American Portfolio's attempts to characterize these fees as a

24   monthly fixed amount, in reality, Defendants are paid a market rate of interest by the Program

25   Banks, as with BDSP.  The amount of the ICAP Fee paid by the Program Banks is "determined

26   based on a fee schedule indexed to the Federal Fund Target Rate" ("FFT").  The formula for the

27   AP Fee was similarly "based on the Federal Funds Target (FFT) Rate" and paid by the Participating

28   Banks:

| Example 1 |
|---|
| Federal Funds Target Rate range = 150 - 175 basis points |
| Midpoint of range is 162.50 basis points > round up to nearest whole number = 163 basis points |
| Monthly per account fee = $1 + ($0.052255 x 163) = $9.52 |
| **Example 2** |
| Federal Funds Target Rate range = 450 - 475 basis points |
| Midpoint of range is 462.50 basis points > round up to nearest whole number = 463 basis points |
| Monthly per account fee = $1 + ($0.052255 x 463) = $25.19 |
| Since $25.19 is greater than the stated maximum monthly fee of $22.50, the actual fee would be $22.50 |

131. As the Federal Fund Target Rate increases, the monthly fee and the compensation that the Osaic Defendants receive also increase. Thus, the Osaic Defendants profit from the spread or difference between the Federal Fund Target Rate and the interest rate paid to clients.

132. The current Osaic monthly per account fee schedule based on the FFT rate is as follows:

| FFT Rate (basis points) | Monthly Per Account Fee |
|---|---|
| 0 to 25 | $8.55 |
| 25 to 50 | $9.00 |
| 50 to 75 | $9.60 |
| 75 to 100 | $10.20 |
| 100 to 125 | $10.85 |
| 125 to 150 | $11.55 |
| 150 to 175 | $12.20 |
| 175 to 200 | $12.75 |
| 200 to 225 | $13.30 |
| 225 to 250 | $14.00 |
| 250 to 275 | $14.70 |
| 275 to 300 | $15.40 |
| 300 to 325 | $16.10 |
| 325 to 350 | $16.80 |
| 350 to 375 | $17.50 |
| 375 to 400 | $18.20 |
| 400 to 425 | $18.90 |
| 425 to 450 | $19.60 |
| 450 to 475 | $20.25 |
| 475 to 500 | $20.75 |
| 500 to 525 | $21.25 |
| 525 to 550 | $21.75 |
| 550 to 575 | $22.50 |
| 575 to 600 | $23.75 |
| 600 + | $25.00 |

133. Currently, the ICAP monthly per account fee that Osaic receives and the rate of interest they pay their clients is as follows:

<u>NFS</u>:

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/ fee-based IRAs accounts | .65% | $19.60 |

<u>Pershing</u>:

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/fee-based IRAs accounts | 0.45% | $23.30 |

134.    Startlingly, while the ICAP Fee and AP Fees are pegged to the Federal Fund Target Rate, ***the rate of interest paid to Osaic accountholders was and still is at all relevant times, substantially less than the Federal Fund Target Rate.***  Indeed, as indicated above, the rates of interest paid to clients under the Insured Cash Program have no correlation whatsoever to the Federal Fund Target Rate.  For example, ICAP clients currently receive a rate of interest of 0.45% to 0.65%, while the Osaic Defendants earn a rate of interest as high as 4.25% to 4.50%.

135.    Defendants continue to set the ICAP Fee to the FFT rate, because they know they can receive significantly higher profits from the Program Banks tied to prevailing market rates, especially when the rates of interest paid to the Osaic customers are artificially depressed. Consequently, the "monthly fixed fee," is significantly "offset" by the "total amounts paid to [Osaic] by the Program Banks," in connection with ICAP as well as BDSP.  Moreover, if whatever reason the [ICAP] fee was not "sufficient," Osaic "***reserve[d] the right to debit your Advisory IRA Account for the amount of any shortfall*** [to the Program Banks]."

136.    Thus, the AP Cash Sweep Program, as well as ICAP, together with BDSP, were purposefully engineered to ensure Defendants' profit, at the expense of their customers. Defendants continue to orchestrate the ICAP Program to maximize their overall return, rather than the accountholders to which they owe fiduciary duties.  By extracting excessive rates of interest (disguised as fees) for themselves and not sharing any of those fees to which the customers were entitled, Defendants breached and continue to breach their fiduciary duties.

137.    The Program Fees provide a very meaningful source of revenue for Defendants, at the direct cost to Osaic customers.  As the Cash Sweep Program documents acknowledge, "*[t]he income we [Osaic] earn from Program Banks based on your balances in BDSP and ICAP will in almost all circumstances be substantially greater than the amount of interest you earn from the same balances*."

138.    The Osaic Defendants earn interest that is similar or even above the prevailing or market rates, while Osaic customers earn a tiny fraction of that interest.  The Clearing Firm Defendants "earn interest, or a return, based on short-term market interest rates prevailing at the time," and then "share[] a portion of this compensation with [Osaic]."  However, Defendants earn even greater returns as they receive "*a substantially greater . . . portion of the Program Fees*" than those paid the Clearing Firms or other service providers.  As a result, Defendants receive a "substantially higher percentage of the interest" than the interest credited to customer accounts.

139.    An example of the benefits Defendants received from the setting of cash sweep interest rates on cash sweep accounts is reflected in net interest income and EBITDA growth from 2019 to present.

140.    In November 2023, Osaic posted an EBITDA – earnings before interest, taxes, depreciation and amortization – margin of 14.6% as of midyear on a trailing 12-month basis, which was significantly higher than its average EBITDA margin of 11% from 2019 to 2022.   As *InvestmentNews* observed, the substantial boost in Osaic's EBITDA is at least partially attributable to net income interest growth:

> "Osaic's net interest income – NII – on cash balances held in sweep accounts improved year-over-year due to the higher rate environment, which has partially offset lower commission-based revenues and revenues linked to market performance," according to the Fitch report from October."

141.    As these record profits show, Defendants were financially incentivized to maintain the artificially low interest rates on sweep accounts to keep the spread as high as possible, thwarting Plaintiff and the Class from receiving a reasonable rate of interest.

1

2

**G.    Defendants Make Materially Misleading Statements and Omit Material Facts Regarding the Cash Sweep Program**

3

4

5

6

7

8

142.    As an investment adviser and as a broker-dealer, the Osaic Defendants have a fiduciary duty to not make any untrue statements or omissions of material fact that are otherwise false or misleading.  *See* FINRA Rule 2210(d)(1)(B) – Communications with the Public ("No member may publish, circulate or distribute any communication that the member knows or has reason to know contains any untrue statement of a material fact or is otherwise false or misleading.").

9

10

11

12

13

14

15

16

143.    The Member Firm Regulation Division of the New York Stock Exchange ("NYSE") emphasized the particular importance of adequate disclosures of cash sweep programs in its Information Memo 05-11, dated February 15, 2005 (the "Information Memo").    The Information Memo states "[i]n some cases . . . cash sweep account programs at member organizations ***may have been instituted or changed without fully appropriate levels of disclosure and customer consent*****.**"  NYSE expressed concern that certain Cash Sweep Programs changes "***may be so significant and beyond the contemplation and reasonable expectations of the customer***" that "***effective subsequent disclosure***" was required.

17

18

19

144.    The Cash Sweep Program Documents contain material omissions by failing to disclose that Defendants established and maintained the Cash Sweep Programs to enrich themselves by paying unreasonably low interest rates to customers.

20

21

145.    As the NYSE explains, this disclosure is critical due to the potential conflict between investment advisers' fiduciary obligations and its financial incentives:

22

23

24

> While a registered investment company . . . . is bound by fiduciary obligations to its shareholders (customers of the member organization) to seek the highest rates prudently available (less disclosed fees and expenses), when customer funds are swept to an affiliated bank ***it is in the interest of the member organization and its affiliates to pay as low a rate as possible***.

25

26

27

146.    The SEC similarly highlighted that "cash sweep programs" are a "common source[] of conflicts of interest" in its Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022.

28

147.    The Information Memo recommended a series of "best practices" – based on NYSE Rules – that were "designed to safeguard investor interests for [cash sweep] programs currently in place." According to the NYSE, failure to follow the practices set forth in the Information Memo may be deemed "conduct inconsistent with good business practice" and/or "with just and equitable principles of trade."

148.    The Information Memo specifically provided that member organizations "***must include in their agreements or disclosure documents any conflicts of interest*** in connection with the cash sweep program," including the following:

> whether the member organization receives compensation or other benefits for customer balances maintained at the bank, and if so the expected range of such compensation, as well as a disclosure of the difference, if any, between the rates of return at the existing money market fund and the proposed bank sweep fund.

149.    Defendants failed to disclose they were operating under the exact conflicts of interest that the Information Memo warned against. The Osaic Cash Program Documents state:

> Our Cash Review Committee meets periodically to review the interest rates paid to clients in the [Bank Deposit Sweep Program] and to determine whether and when the rates will change. Factors considered include the rates paid by Program Banks to obtain deposits from the Sweep Program, expected changes in interest rates, interest rates paid by market competitors, and program expenses.

150.    This statement was misleading and omitted material facts because, in reality, the rates of interest set by Defendants for the Cash Sweep Programs were not based on market factors. In actuality, the Cash Sweep Programs always paid below-market and unreasonably low interest rates rather than "market" interest rates. Unbeknownst to customers, Defendants were not reviewing and setting customers' interest rates based on "expected changes in interest rates" or "rates paid by market competitors," but rather, Defendants set the rates to maximize their own profits.

151.    The Cash Sweep Program Documents also omit material information regarding the Defendants' actual benefit from the Cash Sweep Programs. In contravention of the Information Memo, absent from the Cash Sweep Documents is the actual or expected range of benefits or

1    compensation that the Osaic Defendants, the Program Banks, and the Clearing Firms stood to

2    receive.

3         152.   The Cash Sweep Program Documents also contain materially misleading

4    information and omissions regarding the "fees" that Defendants charge under the Cash Sweep

5    Programs.  These disclosures were misleading because they implied that Defendants received

6    "monthly fixed" fees for administering services under ICAP and AP Cash Sweep Program, when

7    in reality, Defendants have been profiting from the difference between the prevailing market rates

8    and what they pay out to customers.

9         153.   The ICAP Fees and AP Fees were omitted completely from accountholders

10   monthly statements, leading accountholders to believe they were not adversely impacted by such

11   fees or were not being charged fees at all.  In reality, however, these fees were rates of return that

12   belonged to Defendants' customers, but which Defendants siphoned for themselves.

13   **V.     CLASS ACTION ALLEGATIONS**

14        154.   Plaintiff realleges and incorporates by reference the allegations set forth in ¶¶1-156,

15   above.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure

16   23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of:

17        **The Class**:

18        All persons who held cash positions in accounts custodied in the United States by
          Defendants, and whose cash was subject to the Cash Sweep Programs.
19

20        155.   Excluded from the Class are Defendants, including any of their affiliates, officers

21   and directors, members of their immediate families and their legal representatives, heirs,

22   successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

23        156.   Plaintiff reserves the right to amend the Class definition upon conducting further

24   investigation or discovery.

25        157.   The members of the Class are so numerous that joinder of all members is

26   impracticable and the disposition of their claims in a class action will provide substantial benefits

27   to the parties and the Court.

28

158.    Defendants have thousands of customers nationwide and oversee more than $500 billion in client assets through thousands of financial advisors.  The Class thus satisfies the numerosity requirement of Rule 23.

159.    While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail or electronically.  Defendants regularly communicate with the Class by mail and/or electronically.

160.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members.  These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a)    Whether Defendants owed fiduciary duties to Plaintiff and the other Class members, as alleged herein;

(b)    Whether Defendants breached their fiduciary duties to Plaintiff and the other Class members, as alleged herein;

(c)    Whether Defendants' disclosures about the Cash Sweep Programs contained material misrepresentations or omissions;

(d)    Whether Defendants were unjustly enriched by their wrongful conduct;

(e)    Whether Defendants committed gross negligence;

(f)    Whether this case may be maintained as a class action under Federal Rule of Civil Procedure 23;

(g)    Whether and to what extent Plaintiff and the other Class members have sustained damages and the proper measure of damages; and

(h)    Whether and to what extent Plaintiff and the other Class members are entitled to attorneys' fees and costs.

161.    Plaintiff's claims are typical of the other Class members' claims because Plaintiff and the Class sustained damages as a result of Defendants' wrongful conduct since Plaintiff was a customer of Defendants and had his cash balances improperly managed by Defendants through

1  their administration of the Cash Sweep Program.  Thus, Plaintiff's claims are typical of the claims
2  of the other Class members, because all Class members are similarly affected by Defendants'
3  wrongful conduct, and the relief Plaintiff seeks for the Class is common to all Class members.

4        162.    Plaintiff will fairly and adequately protect the interests of other Class members.
5  Plaintiff has retained counsel competent and experienced in complex class action litigation.
6  Plaintiff has no interests adverse or antagonistic to those of the Class.

7        163.    A class action is superior to all other available methods for the fair and efficient
8  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the
9  damages suffered by individual Class members may be relatively small, the expense and burden
10  of individual litigation make it impossible for members of the Class to individually redress the
11  wrongs done to them.  There will be no difficulty in the management of this action as a class action.

12        164.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:
13        (a)    the prosecution of separate actions by individual Class members would
14  create a risk of inconsistent or varying adjudications with respect to individual Class members that
15  would establish incompatible standards of conduct for Defendants;

16        (b)    the prosecution of separate actions by individual Class members would
17  create a risk of adjudications with respect to them which would, as a practical matter, be dispositive
18  of the interests of other Class members not parties to the adjudications, or may substantially impair
19  or impede their ability to protect their interests; and/or

20        (c)    Defendants have acted or refused to act on grounds generally applicable to
21  the Class, thereby making appropriate final and injunctive relief with respect to the Class members
22  as a whole.

23  **VI.    CLAIMS ALLEGED**

24  **FIRST CAUSE OF ACTION**
   **Breach of Fiduciary Duty**
25  **(Against All Defendants)**

26        165.    Plaintiff repeats and incorporates by reference ¶¶1-164, as if fully set forth herein.
27        166.    At all relevant times, the Osaic Defendants, as investment advisers and/or broker-
28  dealers, owed fiduciary duties to Plaintiff and the other Class members in connection with the Cash

1    Sweep Programs.  Such duties arose out of applicable law and industry standards and the Osaic

2    Defendants' exercise of control and discretion over the Cash Sweep Programs.

3        167.    As fiduciaries, the Osaic Defendants owed Plaintiff and the other Class members a

4    duty of loyalty, a duty of care, good faith, candor, and disclosure.  Moreover, the Osaic Defendants

5    owed Plaintiff and the other Class members a duty to act in their best interest, including by placing

6    the interests of their clients ahead of Osaic Defendants' own best interests.

7        168.    Defendants breached their fiduciary duties by the conduct alleged herein, including

8    by: designing, structuring, maintaining, and/or operating the Cash Sweep Programs to benefit

9    themselves at the expense of their fiduciary customers, providing a lower rate of interest to their

10    customers than they were receiving for themselves, making material misrepresentations and

11    omissions regarding the Cash Sweep Programs, violating their duty of care, and acting in their own

12    – not their customers' – best interest with respect to the Cash Sweep Programs.

13        169.    As a direct and proximate consequence of the Osaic Defendants' conduct as alleged

14    herein, Plaintiff and the other Class members suffered damages in an amount to be determined at

15    trial, and seek disgorgement of any undue and unjust gains of the Osaic Defendants, punitive

16    damages, as well as all other equitable relief deemed just and proper.

17                    **SECOND CAUSE OF ACTION**
                        **Gross Negligence**
18                      **(Against All Defendants)**

19        170.    Plaintiff repeats and incorporates by reference ¶¶1-164, as if fully set forth herein.

20        171.    As set forth above, Defendants owed fiduciary duties to Plaintiff and the other Class

21    members in the operation of the Cash Sweep Program.

22        172.    Defendants breached their duties by the conduct alleged herein, including by:

23    designing, structuring, maintaining, and/or operating the Cash Sweep Program to benefit

24    themselves at the expense of their fiduciary customers, providing a lower rate of interest to their

25    customers than they were receiving for themselves, making material misrepresentations and

26    omissions regarding the Cash Sweep Program, violating their duty of care, and acting in their own

27    – not their customers' – best interest with respect to the Cash Sweep Programs.

28

CLASS ACTION COMPLAINT

173.    Defendants' misconduct was grossly negligent because it constituted a reckless disregard for their clients' best interests, and represented an extreme departure from the ordinary standard of care.

174.    The Defendants' misconduct directly and proximately caused financial harm to Plaintiff and the other Class members.  As a result, Plaintiff and the other Class members are entitled to damages from the Defendants, plus prejudgment interest thereon.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(Against All Defendants)**

175.    Plaintiff repeats and incorporates by reference ¶¶1-164, as if fully set forth herein.

176.    Defendants, through their wrongful conduct of sweeping available cash balance from customer accounts into accounts at Program Banks that provided customers with inappropriately low interest rates, received net interest income, fees, and other financial benefits.

177.    As a result, Defendants were unjustly enriched by their misconduct.  Plaintiff, individually and on behalf of the other Class members, alleges that it is inequitable and unjust for Defendants to retain these benefits, including the Program Fees and the net interest income they earned at the expense of their own clients.

178.    Plaintiff and the other Class members suffered financial harm from Defendants' misconduct and are entitled to damages, including the restitution and disgorgement of the profits and other financial benefits unjustly obtained by Defendants.

**FOURTH CAUSE OF ACTION**
**Violation of the Investment Advisers Act of 1940**
**(Against All Defendants)**

179.    Plaintiff repeats and incorporates by reference ¶¶1-164, as if fully set forth herein.

180.    APA was registered as an investment adviser under the Advisers Act.  Osaic owns and controls APA.  Osaic Wealth is a registered investment adviser under the Advisers Act.  Osaic owns and controls Osaic Wealth.

181.    For the reasons alleged herein, APA and Osaic Wealth violated §206 of the Advisers Act in connection with their operations of the Cash Sweep Programs by failing to serve the best interests of their clients, by placing their own interests ahead of the interests of its clients,

and by failing to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act. *See* 15 U.S.C. §80b-6; Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act Release No. 5248, 84 Fed. Reg. 33669 (July 12, 2019).

182. The Account Agreement should be deemed void pursuant to §215(b) of the Advisers Act. *See* 15 U.S.C. §80b-15.

183. Accordingly, Plaintiff and the Class seek rescission of the Account Agreements and restitution of the consideration given pursuant to its purported terms.

## VII. REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other Class members, requests relief as follows:

A.  Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.  Ordering Defendants to pay actual damages (including punitive damages) and restitution to Plaintiff and the other Class members, as allowable by law;

C.  Ordering disgorgement of profits obtained by Defendants as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.  Ordering injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

E.  Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F.  Ordering Defendants to pay attorneys' fees and costs of suit; and

G.  Ordering such other and further relief as may be just and proper.

CLASS ACTION COMPLAINT

1

## VIII.  DEMAND FOR JURY TRIAL

2          Plaintiff demands a trial by jury on all claims so triable.

3   DATED:  February 4, 2025

4                                                          *s/ Travis P. Roberts*
                                                          TRAVIS P. ROBERTS

5
                                        Thomas A. Gilson
6                                       Travis P. Roberts
                                        **BEUS O'CONNOR MCGRODER PLLC**
7                                       701 N. 44th Street
                                        Phoenix, Arizona  85008
8                                       Tel.: (480) 429-3000
                                        tgilson@BOMlawgroup.com
9
                                        *Local Counsel for Plaintiff and the Proposed*
10                                      *Class*

11                                      Adam J. Levitt (Bar No. 5126602)
12                                      **DiCELLO LEVITT LLP**
                                        Ten North Dearborn Street, Sixth Floor
13                                      Chicago, Illinois  60602
                                        Tel.: (312) 214-7900
14                                      alevitt@dicellolevitt.com

15                                      Alexander E. Barnett*
                                        Jarett N. Sena*
16                                      **DiCELLO LEVITT LLP**
17                                      485 Lexington Avenue, Suite 1001
                                        New York, New York  10017
18                                      Tel.: (646) 933-1000
                                        abarnett@dicellolevitt.com
19                                      jsena@dicellolevitt.com

20                                      Brian O. O'Mara*
21                                      Steven M. Jodlowski*
                                        **DiCELLO LEVITT LLP**
22                                      4747 Executive Drive, Suite 240
                                        San Diego, California  92121
23                                      Tel.:  (619) 923-3939
                                        briano@dicellolevitt.com
24                                      stevej@dicellolevitt.com

25

26

27

28

**CLASS ACTION COMPLAINT**

Kim D. Stephens, P.S.*
Jason T. Dennett*
**TOUSLEY BRAIN STEPHENS PLLC**
1200 5th Avenue, Suite 1700
Seattle, Washington  98101
Tel.: (206) 682-5600
kstephens@tousley.com
jdennett@tousley.com

Leo Kandinov*
**MORRIS KANDINOV LLP**
550 West B Street, 4th Floor
San Diego, California  92101
Tel.: (619) 780-3993
leo@moka.law

Aaron Morris*
Andrew Robertson*
**MORRIS KANDINOV LLP**
305 Broadway, 7th Floor
New York, New York  10007
Tel.: (332) 240-4024
aaron@moka.law
andrew@moka.law

Jonathan R. Chally*
Stephen D. Councill*
Joshua P. Gunnemann*
**COUNCILL, GUNNEMANN & CHALLY, LLC**
75 14th Street, NE, Suite 2475
Atlanta, Georgia  30309
Tel.: (404) 407-5250
jchally@cgclaw.com
scouncill@cgc-law.com
jgunnemann@cgc-law.com

*Counsel for Plaintiff and the Proposed Class*

* *pro hac vice* forthcoming

CLASS ACTION COMPLAINT