**WO**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

Robert Gehring, et al.,

          Plaintiffs,

v.

Osaic Incorporated, et al.,

          Defendants.

No. CV-25-00367-PHX-KML

**ORDER**

    This suit is one of many filed in recent years against financial firms involving the operation of "cash sweep programs." These programs allow financial firms to sweep uninvested money out of their client accounts and place it with a list of selected banks to invest or lend. The banks pay interest to the financial firms, but the firms pass along only a fraction of that interest to their clients. Plaintiffs Robert Gehring, Harold Hunt, and Jeana Norris participated in cash sweep programs offered by certain defendants. According to plaintiffs, the way those programs operated constituted breaches of contract or unjust enrichment, breaches of fiduciary duty, and violations of a federal statute. Some of plaintiffs' claims fail, but the central claims involving breach of contract and breach of fiduciary duty may proceed.

### I.    Background

#### A.  Defendants

    Defendants are American Portfolios Advisors, Inc. ("APA"), Osaic Wealth, Inc. ("Osaic Wealth"), Osaic Institutions, Inc. ("Osaic Institutions")—collectively "Osaic

Broker-Advisors"—and Osaic, Inc. There is a complicated history of acquisitions and name changes related to the defendants, which is mostly irrelevant for present purposes. (*See* Doc. 17 at 9–11.) The following is a greatly-simplified version of that history.

Osaic, Inc. is a Maryland corporation headquartered in Arizona. (Doc. 17 at 7.) Osaic, Inc. is the parent company of the Osaic Broker-Advisors. In 2022, Osaic, Inc. (then called "Advisor Group Holdings, Inc.") acquired American Portfolios Holdings, Inc., which in turn owned APA and its affiliated broker-dealer American Portfolios Financial Services ("APFS"). (Doc. 17 at 7–8.)

APA was a Delaware corporation headquartered in New York. (Doc. 17 at 7.) APA was formerly registered as an investment advisor with the SEC. (Doc. 17 at 7.) APA offered personalized investment advisory services to individuals and many other business entities, and recommended advisory clients establish accounts through APFS for trade execution and account service. (Doc. 17 at 7.) Following its 2022 acquisition, APA was subsumed into Osaic Wealth, along with its affiliate APFS. (Doc. 17 at 8.)

Osaic Wealth is a Delaware corporation and SEC-registered broker-dealer and investment advisor headquartered in Arizona. (Doc. 17 at 8.) Osaic Wealth is the company into which APA and APFS were consolidated and integrated. (Doc. 17 at 8.)

Osaic Institutions is an SEC-registered broker-dealer and investment advisor incorporated and headquartered in Connecticut. (Doc. 17 at 8.) Osaic Institutions is the successor to Infinex Financial Group, which Osaic, Inc. acquired in 2022. (Doc. 17 at 8.)

**B. Plaintiffs**

Plaintiffs are Robert Gehring, Harold Hunt, and Jeana Norris. Gehring, Hunt, and Norris seek to represent a class of investors who participated in the defendants' cash sweep programs and were allegedly underpaid on their cash balances.

Gehring is an individual investor from New Hampshire who maintained both an APA advisory individual retirement account ("IRA") and a separate non-advisory IRA through APFS beginning in 2016. (Docs. 17 at 6; 28 at 7.) After the consolidation of APA and APFS into Osaic Wealth, customer accounts continued under the Osaic cash sweep

program. (Doc. 17 at 8, 22.) Gehring's APA advisory account was closed the day before the acquisition (Doc. 29 at 10), but it appears his non-advisory account with APFS continued under the sweep program at Osaic Wealth.

Hunt and Norris, both Tennessee residents, opened self-directed IRAs with Infinex Investments in 2016 and 2015, respectively. (Docs. 17 at 6–7; 30 at 10.) After Osaic, Inc.'s acquisition of Infinex, their accounts became Osaic Institutions accounts. (Doc. 17 at 26.)

All three plaintiffs allege their uninvested cash was moved into defendants' cash sweep programs and that they were subsequently paid unreasonably low interest rates.

## C. Cash Sweep Programs

A cash sweep program is a common offering from investment advisors and brokerages. (Doc. 37 at 13.) A typical cash sweep program takes idle funds (*e.g.*, funds not currently invested) and "sweeps" them into an interest-bearing account to earn money in the interim. (Doc. 37 at 13.) Generally, customers with brokerage or investment accounts are paid out a portion of the interest generated by the swept funds. (Doc. 17 at 4.) The operation of the cash sweep programs at issue in this case is set forth in the complaint, which the court accepts for purposes of the motions to dismiss.

Here, defendants provided a cash sweep program to customers with brokerage accounts, investment advisory accounts, and IRAs. (Doc. 17 at 20.) Defendants designed their cash sweep program to ensure they retained nearly all of the interest earnings. (Doc. 37 at 13.) Under the sweep program, uninvested cash is automatically transferred to interest-bearing deposit accounts at participating program banks. (Doc. 17 at 22–23.) The banks pay interest to defendants, which in turn pay a lower rate to customers, retaining the difference as revenue. Customers are automatically enrolled in the sweep program when opening brokerage or advisory accounts unless they affirmatively opt out. (Doc. 37 at 14, 34.) Customers who opt out may leave funds as a "free credit balance," which does not earn interest and is not FDIC-insured. (*See* Doc. 37-2 at 13.)

Plaintiffs allege defendants' standardized account agreements incorporated sweep-program materials and imposed obligations to act in clients' best interests and to set and

periodically review sweep interest rates based on economic, market, and business conditions, including paying a "reasonable" rate. (Doc. 17 at 16–20.) Plaintiffs cite, among other materials, Osaic Wealth's and Osaic Institutions' Form Client Relationship Summaries and a Broker Dealer Firm Brochure as reflecting best-interest and fiduciary-type commitments in connection with brokerage and advisory services. (Doc. 17 at 13, 16–17.) Plaintiffs also allege defendants' retirement-account materials include fiduciary acknowledgments and other representations emphasizing reasonable rates of return on IRA cash balances. (Doc. 17 at 18–19.) Plaintiffs contend defendants breached these contractual and fiduciary obligations by designing and maintaining the sweep program to benefit defendants more than clients, including by paying unreasonably low sweep rates and recommending continued use of the sweep program. (Doc. 17 at 46–47.) Plaintiffs further allege fiduciary obligations arising under the Investment Advisers Act of 1940 ("IAA") and the Regulation Best Interest: The Broker Dealer Standard of Conduct. (Doc. 17 at 11–13.) Plaintiffs also point to the Internal Revenue Code and U.S. Treasury Regulations as requiring reasonable interest rates for some or all sweep deposits. (Doc. 17 at 15–16.)

According to plaintiffs, defendants failed to honor their contractual and fiduciary obligations, which became particularly apparent when short-term interest rates rose sharply beginning in March 2022. (Doc. 17 at 5.) While benchmark rates climbed above 5%, sweep rates allegedly remained near zero (and never more than 1.5%, depending on balances), allowing defendants to retain most of the increased spread and generate millions of dollars in revenue. (Docs. 17 at 5–6, 31–32, 35; 27-10 at 8.)

Defendants do not dispute sweep rates remained low relative to benchmark rates but contend all material terms were disclosed and no promise of "reasonable" or market-matching rates was made. (Doc. 30 at 7.) Defendants also contend customers could have opted out or selected alternative products (such as money market funds) if they sought higher yields. (Doc. 29 at 9–10.) The documents defendants ask the court to consider emphasize that sweep rates may vary over time and may be zero. (Docs. 29 at 6; 27-15 at 7; 27-27 at 25.)

### D. Claims Alleged

Based on the above facts, plaintiffs assert the following claims:

1.  Gehring, Hunt, and Norris allege breach of fiduciary duty against all defendants. (Doc. 17 at 46.)

2.  Gehring, Hunt, and Norris allege breach of contract against all defendants. (Doc. 17 at 47.)

3.  Gehring, Hunt, and Norris allege unjust enrichment against all defendants. (Doc. 17 at 48.)

4.  Gehring, Hunt, and Norris allege a violation of the IAA, 15 U.S.C. § 80b-1 *et seq.*, against APA, Osaic Wealth, and Osaic Institutions.[1] (Docs. 17 at 49; 37 at 48.)

## II.  Legal Standards

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (simplified). This is not a "probability requirement," but a requirement that the factual allegations show "more than a sheer possibility that a defendant has acted unlawfully." *Id*. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

As to statute-of-limitations arguments, a claim will be dismissed as untimely at the pleading stage only when the statute-of-limitations violation is apparent on the face of the complaint. *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 969 (9th Cir. 2010). Dismissal is only appropriate when it appears beyond doubt that the plaintiff can prove no set of facts establishing the timeliness of the claim. *Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995). In other words, for dismissal to occur at this stage, untimeliness must be obvious and there must be no real possibility a plaintiff

---

[1] The IAA claim against Osaic, Inc. was withdrawn in plaintiffs' response. (Doc. 37 at 53.)

could show the claim is timely.

### III.    Parent Company Liability Against Osaic, Inc.

Plaintiffs apparently seek to hold the parent company Osaic, Inc. liable under several overlapping theories. First, plaintiffs expressly contend Osaic, Inc.'s subsidiary companies—Osaic Wealth, Osaic Institutions, and APA—acted as its agents, such that Osaic, Inc. is vicariously liable for their breaches of contract and fiduciary duty under principles of respondeat superior. (Doc. 17 at 47–48.) Second, by hinting that Osaic, Inc. disregarded the corporate separateness of its subsidiaries and therefore should be liable for any breaches committed by the Osaic Broker-Advisors, plaintiffs' allegations imply a broader alter-ego or veil-piercing theory. (*See* Doc. 17 at 47–48 (alleging Osaic, Inc. "knowingly encouraged, directed, and participated in" the breaches of the Osaic Broker-Advisors).) Finally, plaintiffs contend Osaic, Inc. was itself a party to the contracts at issue by virtue of statements in a cash sweep program brochure allegedly identifying it as one of the entities controlling the program. (*See* Docs. 17 at 47–48; 37 at 51–52.) Osaic, Inc. contests each of these theories. (*See generally* Doc. 28.)

Plaintiffs do not clearly identify the law governing most of their claims. In cases filed under the Class Action Fairness Act like this one, a court should ordinarily apply the forum state's choice-of-law rules to state-law claims. *In re Hyundai & Kia Fuel Econ. Litig.*, 926 F.3d 539, 561 (9th Cir. 2019) (en banc). Arizona follows the Restatement's "most significant relationship" test for choice-of-law issues. *Labertew v. Chartis Prop. Cas. Co.*, 363 F. Supp. 3d 1031, 1036 (D. Ariz. 2019); *Bates v. Superior Court*, 749 P.2d 1367, 1369–70 (Ariz. 1988). Defendants analyze most issues under New York and Connecticut law, and plaintiffs do not object. Although the court is dubious that New York or Connecticut law would apply to claims for breach of fiduciary duty and unjust enrichment against Osaic, Inc., a Maryland company headquartered in Arizona, it appears the outcome would not differ if Arizona law applied. The court therefore analyzes Osaic, Inc.'s motion to dismiss under the law the parties cited. *See In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1495 (D.C. Cir. 1991) ("Unlike jurisdictional issues, courts

need not address choice of law questions sua sponte."); *see also Mont. Power Co. v. Pub. Util. Dist. No. 2 of Grant Cnty., Wash.*, 587 F.2d 1019, 1022 (9th Cir. 1978). In any amended complaint, plaintiffs should make clearer the applicable laws.

### A. Analysis

#### i. Breach of Contract

Osaic, Inc. is the parent company of the Osaic Broker-Advisors. It is undisputed that Osaic, Inc. was not a signatory to any customer or advisory contract at issue; those contracts were executed between plaintiffs and the respective subsidiaries. Plaintiffs' contract-based claims nonetheless rest on the assertion that Osaic, Inc. was either a party to the customer contracts or vicariously liable for its subsidiaries' contractual breaches. Neither theory is supported by the complaint.

The only document plaintiffs cite connecting Osaic, Inc. directly to their contracts is the "Sweep Program Disclosure Document." (Doc. 37 at 51.) That document states: "Osaic, Inc., through its affiliated Broker-Dealers, Osaic Institutions Inc. and Osaic Wealth, Inc., (referred to as 'Broker-Dealer,' 'we', 'our', or 'us') offers a cash sweep program ('Sweep Program') for [certain] accounts[.]" (Doc. 27-10 at 2.) Plaintiffs contend that using the word "we" makes Osaic, Inc. a party to the contract. But "we" appears to refer only to the affiliated broker-dealers Osaic Institutions and Osaic Wealth, the entities authorized to contract with customers. Nothing in the Sweep Program Disclosure Document or plaintiffs' complaint suggests Osaic, Inc. executed, guaranteed, or assumed any contractual agreements with plaintiffs. *See, e.g., MBIA Ins. Corp. v. Royal Bank of Can.*, 958 N.Y.S.2d 62, 2010 WL 3294302, at *25 (N.Y. Sup. Ct. 2010) (non-party business's name or logo on marketing materials "simply insufficient" to plead breach of contract); *see also Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l, Inc.*, 2 F.3d 24, 26 (2d Cir. 1993) ("a parent corporation and its subsidiary are [generally] regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both.").

Even Osaic, Inc. directing or benefiting from its subsidiaries' contractual

performance would not establish privity. Under both New York and Connecticut law, which likely do apply to any breach-of-contract claims, a party may not be held liable for breach of a contract to which it was not a signatory. *See Arroyo v. Cent. Islip UFSD*, 103 N.Y.S.3d 512, 514 (N.Y. App. Div. 2019); *see also Coburn v. Lenox Homes, Inc.*, 378 A.2d 599, 601 (Conn. 1977). Under those laws, a parent corporation cannot be liable for a subsidiary's contracts merely by virtue of ownership or participation in making policies. *Maki v. Travelers Cos., Inc.*, 44 N.Y.S.3d 220, 223 (N.Y. App. Div. 2016); *Hess v. L.G. Balfour Co.*, 822 F. Supp. 84, 86–87 (D. Conn. 1993).

Nor do plaintiffs plausibly allege facts establishing a principal-agent relationship between Osaic, Inc. and its subsidiaries. To show the existence of an agency relationship, a plaintiff must demonstrate (1) the principal authorized the agent to act on the principal's behalf, (2) the agent agreed to do so, and (3) the principal had the right to direct or control how the agent carried out that work. *See Wesley v. Schaller Subaru, Inc.*, 893 A.2d 389, 400 (Conn. 2006); *see also N. Shipping Funds I, LLC v. Icon Cap. Corp.*, 921 F. Supp. 2d 94, 103 (S.D.N.Y. 2013). Plaintiffs allege no facts plausibly establishing a principal-agent relationship, and they cite no authority supporting respondeat superior liability of a parent for a subsidiary's conduct. Regardless, New York law does not seem to support such a theory. *See Abdelhamid v. Altria Grp., Inc.*, 515 F. Supp. 2d 384, 394 (S.D.N.Y. 2007) (respondeat superior does not render parent company liable for conduct of subsidiary). And under Connecticut law, a parent may be treated as a principal only where its domination or interference is so complete that the subsidiary functions as its agent—something not sufficiently alleged here. *See Hess v. L.G. Balfour Co.*, 822 F. Supp. 84, 85 (D. Conn. 1993). As a result, the agency theory fails. The same result follows if analyzed under Arizona law. *See Ruesga v. Kindred Nursing Ctrs., L.L.C.*, 161 P.3d 1253, 1261–62 (Ariz. Ct. App. 2007).

Finally, to the extent plaintiffs attempt to plead alter-ego, that theory fares no better because plaintiffs do not allege facts that would justify piercing the corporate veil. Osaic, Inc. cites Maryland law as governing this question because Osaic, Inc. is a Maryland

corporation (Doc. 28 at 11), and Arizona's choice-of-law rules confirm Maryland law applies. *See TFH Props., LLC v. MCM Dev., LLC*, No. CV-09-8050-PCT-FJM, 2010 WL 2720843, at *5 (D. Ariz. July 9, 2010). Maryland recognizes several situations where the subsidiary's corporate entity will be disregarded. Those situations include where the corporation is used merely as a shield for the perpetration of fraud, where necessary "to prevent evasion of legal obligations," and where the corporation serves merely as an alter-ego of the parent company (*e.g.*, the parent company fails to observe the corporate entity and deals with the subsidiary's "property as if it were [the parent company's]"). *Hildreth v. Tidewater Equip. Co.*, 838 A.2d 1204, 1210 (Md. 2003). Here, plaintiffs allege no facts to justify piercing the corporate veil such as undercapitalization, commingling, or misuse of the corporate form—they merely allege common ownership and profit sharing. *See id.* Those allegations do not meet Maryland's standard for disregarding corporate separateness and piercing the corporate veil.

Accordingly, the breach-of-contract claim against Osaic, Inc. fails because plaintiffs do not allege facts to demonstrate privity, agency, or any basis for veil-piercing.

### ii. Fiduciary Duty

Plaintiffs also seek to hold Osaic, Inc. liable for breaches of fiduciary duty, claiming it "encouraged, directed, and participated in" its subsidiaries' management of customer cash and that its disclosures identify it as a participant in the investment program. (Docs. 17 at 47–48; 37 at 52–53.) They argue Osaic, Inc.'s level of control gave rise to a fiduciary relationship or, alternatively—as raised for the first time in plaintiffs' response to the motions to dismiss—that Osaic, Inc. aided and abetted its subsidiaries' fiduciary breaches. (Doc. 37 at 52–53.)

Plaintiffs' allegations are insufficient under either theory. To state a claim for breach of fiduciary duty under New York and Connecticut law, a plaintiff must allege (1) the existence of a fiduciary relationship, (2) misconduct by the fiduciary, and (3) resulting damages. *See Litvinoff v. Wright*, 54 N.Y.S.3d 22, 24 (N.Y. App. Div. 2017); *see also Chioffi v. Martin*, 186 A.3d 15, 33 (Conn. App. Ct. 2018). Here, there is no contractual

fiduciary relationship between plaintiffs and Osaic, Inc. Bare allegations that Osaic, Inc. directed or managed the Osaic Broker-Advisors do not establish a fiduciary relationship. *See Marmelstein v. Kehillat New Hempstead*, 892 N.E.2d 375, 378 (N.Y. 2008) (general assertions alone inadequate to establish fiduciary relationship); *see also Saint Bernard Sch. of Montville, Inc. v. Bank of Am.*, 95 A.3d 1063, 1077–78 (Conn. 2014). Applying Arizona law produces the same result. *See Standard Chartered PLC v. Price Waterhouse*, 945 P.2d 317, 335 (Ariz. Ct. App. 1996), *as corrected on denial of reconsideration* (Jan. 13, 1997).

The complaint also does not establish the elements of aiding and abetting, which plaintiffs now claim they attempted to plead in the alternative. (*See* Doc. 37 at 53.) Under New York law, the claim of aiding and abetting tortious conduct requires three elements: "(1) a breach by a fiduciary of obligations to another, (2) knowing participation by defendant in the breach, and (3) damages to plaintiff." *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 245 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998). Once again, there are no allegations to show Osaic, Inc. knowingly participated in its subsidiaries' breaches, so a claim of aiding and abetting fails. Arizona law leads to the same result. *See Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Loc. No. 395 Pension Tr. Fund*, 38 P.3d 12, 23 (Ariz. 2002), *as corrected* (Apr. 9, 2002). Accordingly, the breach of fiduciary duty claim against Osaic, Inc. is dismissed.

### iii.  Unjust Enrichment

Lastly, plaintiffs allege Osaic, Inc. was unjustly enriched because it received a portion of the interest collected through the subsidiaries' cash sweep programs. (Doc. 37 at 53.) Under New York law, an unjust-enrichment claim requires that (1) the defendant benefited, (2) at the plaintiff's expense, and (3) equity and good conscience require that restitution be made. *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006). Connecticut law requires (1) a benefit to the defendant, (2) for which the defendant unjustly did not pay, (3) to the detriment of the plaintiff. *Vertex, Inc. v. City of Waterbury,* 898 A.2d 178, 190 (Conn. 2006). Though possible Osaic, Inc. benefited from the profits earned by its subsidiaries, plaintiffs'

allegations fail to demonstrate why equity and good conscience require restitution under New York law. Nor do plaintiffs plausibly allege that Osaic, Inc. itself received a benefit from plaintiffs for which it unjustly failed to pay, as required under Connecticut law, and the same results follow under Arizona law. *See Freeman v. Sorchych*, 245 P.3d 927, 936 (Ariz. Ct. App. 2011). Accordingly, the unjust-enrichment claim against Osaic, Inc. fails.

## B. Conclusion

Plaintiffs have not provided a plausible basis to conclude Osaic, Inc. is a proper defendant for any of the claims alleged. The claims against Osaic, Inc. are therefore dismissed.

## IV. Claims Against APA, Osaic Institutions, and Osaic Wealth

Once again, plaintiffs do not identify the law governing each claim. Gehring's breach-of-contract claims against APA appear subject to a choice-of-law provision. (Doc. 27-16 at 6.) The parties otherwise assume New York law governs Gehring's claims against APA and Osaic Wealth and Connecticut law governs Norris and Hunt's claims against Osaic Institutions. Because the parties do not dispute these choices of law, the court assumes they are correct. *See In re Korean Air*, 932 F.2d at 1495; *see also Montana Power*, 587 F.2d at 1022.

## A. Breach of Contract

Gehring had an advisory account with APA and a non-advisory brokerage account with Osaic Wealth. Hunt and Norris maintained non-advisory accounts with Osaic Institutions. Plaintiffs allege the account agreements incorporated sweep disclosures requiring periodic rate-setting and review, while defendants contend the disclosures are non-contractual and they complied by paying the disclosed rates.

### i. Statute of Limitations

The statute of limitations for breach of contract under New York and Connecticut law is six years. N.Y. C.P.L.R. § 213(2); Conn. Gen. Stat. § 52-576(a). A claim accrues when the breach occurs, even if the plaintiff is unaware of it at the time. *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015); *Bouchard v. State Emps. Ret.*

1    *Comm'n*, 178 A.3d 1023, 1037 (Conn. 2018). However, under New York and Connecticut

2    law, when a contract requires continued performance over a period of time, each breach

3    gives rise to a new statute-of-limitations period. *Guilbert v. Gardner*, 480 F.3d 140, 150

4    (2d Cir. 2007); *Bouchard*, 178 A.3d at 1039 n.14.

5          The Osaic Broker-Advisors contend the claims accrued when plaintiffs opened their

6    accounts or entered the relevant agreements (Docs. 29 at 11–13; 30 at 12–15), but plaintiffs

7    allege the governing agreements required ongoing performance in the form of periodic

8    rate-setting and review, and that the Osaic Broker-Advisors underpaid interest with each

9    sweep cycle—breaches that are still "ongoing" (Docs. 17 at 5, 47–48; 37 at 19–20). Under

10   the continuing-performance doctrine recognized in New York and Connecticut, each

11   alleged underpayment may constitute a separate breach triggering a new limitations period.

12   *Guilbert*, 480 F.3d at 150; *see also Bouchard*, 178 A.3d at 1039 n.14. At the pleading stage,

13   plaintiffs plausibly allege actionable breaches within the limitations window, so dismissal

14   on timeliness grounds is not warranted.

15            **ii.  Merits**

16         Under New York and Connecticut law, a claim for breach of contract lies where a

17   plaintiff alleges (1) the existence of a contract; (2) plaintiff's performance under the

18   contract; (3) defendant's breach of the contract; and (4) damages. *See Berman v. Sugo LLC*,

19   580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008); *see also Prysmian Cables & Sys. USA LLC v.

20   ADT Com. LLC*, 665 F. Supp. 3d 236, 244 (D. Conn. 2023).

21         Here, the parties agree valid contracts govern the accounts, but dispute whether

22   plaintiffs plausibly allege a breach. Plaintiffs point to various disclosures, program

23   descriptions, and account-opening materials that—according to them—collectively form

24   the governing agreements and contain rate-setting and review commitments, including

25   "reasonable" rate language and commitments to periodic review and adjustment. (Docs. 17

26   at 16–20; 37 at 13–16, 23–24.) The Osaic Broker-Advisors argue these materials are not

27   contractual and only the client agreements themselves are enforceable. (Doc. 39 at 10.)

28   Similar cash sweep cases have treated disclosure statements like the ones relied on here as

part of the contractual relationship. *See Mehlman v. Ameriprise Fin., Inc.*, No. CV 24-3018 (JRT/DLM), 2025 WL 2403252, at *2 (D. Minn. Aug. 19, 2025). Because the complaint relies on the documents plaintiffs identify as part of the agreements and both sides rely on the same materials without disputing their authenticity, the court considers them under the incorporation-by-reference doctrine. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002–03 (9th Cir. 2018).

Assuming these materials are part of the contracts, they plausibly impose obligations extending beyond simply paying whatever rate defendants chose to disclose. The documents describe rate-setting and periodic-review responsibilities, and commit to managing cash sweeps in accord with the Osaic Broker-Advisors' advisory duties. (Docs. 17 at 18, 26, 28; 27-10 at 6.) At this stage, the agreements do not clearly foreclose plaintiffs' interpretation that the Broker-Advisors had a contractual duty to periodically reconsider or adjust sweep rates in accordance with the criteria described in the governing documents. Plaintiffs also plead facts supporting a plausible inference the Broker-Advisors did not perform the promised rate-setting and review. While benchmark rates and market conditions changed substantially, defendants' sweep rates remained largely static, and defendants retained the increased spread as revenue. (Docs. 37 at 17–18; 17 at 31–35.) Those allegations plausibly support an inference that the Broker-Advisors failed to undertake the rate-setting and review process in the manner plaintiffs allege the agreements required. *See Liberty Cap. Grp. v. Oppenheimer Holdings Inc.*, 802 F. Supp. 3d 701, 712–14 (S.D.N.Y. 2025); *see also In re Wells Fargo Cash Sweep Litig.*, No. 24-CV-04616-VC, 2025 WL 1785315, at *2 (N.D. Cal. June 27, 2025).

At this stage, the court need not definitively interpret the contracts or decide whether the rates were "reasonable." The question is whether plaintiffs plausibly allege that the governing agreements imposed ongoing obligations regarding sweep-rate setting and that defendants breached those obligations. Plaintiffs have done so. Accordingly, the breach-of-contract claims survive to the extent they are based on alleged failures to adjust or reconsider sweep rates in accordance with the governing agreements.

### B.  Breach of Fiduciary Duty

Plaintiffs allege the Osaic Broker-Advisors owed them fiduciary duties and breached those duties by setting sweep-account interest rates in a manner that placed the Broker-Advisors' financial interests over those of their customers.

#### i.    Statute of Limitations

Under New York law, fiduciary-duty claims seeking monetary damages are subject to a three-year limitations period. *Liberty Cap.*, 802 F. Supp. 3d at 711 n.6. Such claims generally accrue upon the alleged breach or, if the fiduciary relationship continues, when the fiduciary openly repudiates its obligations. *See Westchester Religious Inst. v. Kamerman,* 691 N.Y.S.2d 502, 503 (N.Y. App. Div. 1999). Connecticut law also imposes a three-year limitations period. Conn. Gen. Stat. § 52-577; *Flannery v. Singer Asset Fin. Co., LLC*, 17 A.3d 509, 513 (Conn. App. Ct. 2011), *aff'd*, 94 A.3d 553 (2014).

The Osaic Broker-Advisors argue any fiduciary-duty claims accrued when plaintiffs first received any allegedly-inadequate sweep. (Doc. 39 at 14–15.) But plaintiffs allege an ongoing fiduciary relationship period extending through the relevant period and repeated failures by the Osaic Broker-Advisors to act in plaintiffs' best interest with each cash sweep and each determination of interest rates. (Doc. 17 at 11–13.) The complaint does not clearly establish that any of the Osaic Broker-Advisors openly repudiated any fiduciary obligations more than three years before this lawsuit was filed. As with the contract claims, plaintiffs plausibly allege actionable breaches within the limitations period. *See Miller v. Metro. Life Ins. Co.*, 979 F.3d 118, 122 (2d Cir. 2020) (each breach of continuing duty may extend statute of limitations); *see also Tunick v. Tunick*, 242 A.3d 1011, 1027–28 (Conn. App. Ct. 2020). The fiduciary-duty claims therefore are timely at least as to conduct within three years of filing.

#### ii.    Merits

Whether the Osaic Broker-Advisors owed plaintiffs a fiduciary duty depends on whether the subject accounts were advisory or non-advisory. Investment advisors owe their clients a duty to act in the client's best interests and to avoid conflicts of interest. *SEC v.*

1   *Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963). Discretionary authority to trade

2   without prior client approval can support a fiduciary relationship even with a non-advisor.

3   *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002); *Press v.*

4   *Chem. Inv. Servs. Corp.*, 988 F. Supp. 375, 386 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 529 (2d

5   Cir. 1999) (absent discretionary trading authority broker does not owe a general fiduciary

6   duty).

7      Plaintiffs allege APA had total discretionary control over the funds in Gehring's

8   advisory account and breached its fiduciary duty by steering client funds into sweep

9   arrangements that maximized firm revenue at the expense of client returns. (Docs. 17 at

10  11–12; 37 at 35, 37.) Given the level of discretion, the allegations are sufficient to state a

11  fiduciary-duty claim for Gehring's APA advisory account. *See Liberty Cap.*, 802 F. Supp.

12  3d at 716; *In re Wells Fargo*, 2025 WL 1785315, at *3.[2]

13     By contrast, non-advisory services generally do not create fiduciary duties,

14  particularly in the absence of discretion to trade without approval. *See Liberty Cap.*, 802

15  F. Supp. 3d at 716–17; *In re Wells Fargo*, 2025 WL 1785315, at *3; *Wells Fargo Advisors,*

16  *LLC v. Bongiorno Fam., LLC*, No. FSTCV126013831S, 2018 WL 1385252, at *9 (Conn.

17  Super. Ct. Feb. 16, 2018) (holding broker is not fiduciary if account is non-discretionary).

18  Gehring's brokerage IRA with Osaic Wealth and Hunt and Norris's IRAs with Osaic

19  Institutions were explicitly classified as non-advisory. (Doc. 17 at 6–7.)

20     Plaintiffs argue Osaic Wealth and Osaic Institutions exercised "discretionary

21  management" over the funds over because they selected sweep program terms, set default

22  enrollment, selected participating banks, and set sweep rates.  (Doc. 37 at 34, 42, 44–45.)

23  But without more, those allegations do not plausibly plead the type of discretion giving rise

24  to a fiduciary relationship in a brokerage context, which requires discretionary authority to

25  make individualized investment decisions or execute transactions in the customer's

26  account without the customer's direction. *See DeBlasio v. Merrill Lynch & Co.*, No.

---

[2] The Osaic Broker-Advisors provide documents showing Gehring's advisory account with APA was closed on June 21, 2022 (Doc. 27-25 at 2), the day before APA was acquired by Osaic, Inc. (Doc. 17 at 8). Gehring does not contest that the closure occurred or provide factual allegations suggesting he had an advisory account with any other defendants.

07CIV318RJS, 2009 WL 2242605, at *29 (S.D.N.Y. July 27, 2009); *de Kwiatkowski*, 306 F.3d at 1302–03; *Liberty Cap.*, 802 F. Supp. 3d at 716–17; *Bongiorno Fam.*, 2018 WL 1385252, at *9.

Accordingly, only Gehring's advisory account through APA gives rise to a fiduciary duty. The fiduciary-duty claims are dismissed as to all non-advisory accounts.

### C. Unjust Enrichment

Plaintiffs allege the Osaic Broker-Advisors were unjustly enriched by retaining the spread between interest earned from program banks and the rates paid to customers. The Broker-Advisors argue these claims are barred because written account agreements govern the very subject matter of the dispute, so any remedy must therefore arise under contract law and not equity.

### i. Statute of Limitations

Under New York law, unjust-enrichment claims carry a six-year limitations period. N.Y. C.P.L.R. § 213(1). Connecticut's period is either three years, Conn. Gen. Stat. § 52-577, or six years depending on the factual basis for the claim. *See Bennett v. Fiorillo*, No. CV166065144S, 2017 WL 3175937, at *2 (Conn. Super. Ct. June 16, 2017) (applying six-year statute-of-limitations period to unjust-enrichment claim stemming from contractual agreement).

Here, plaintiffs allege repeated instances in which the Osaic Broker-Advisors may have unjustly retained sweep revenue or otherwise benefited from setting interest rates at levels far below what plaintiffs contend was reasonable. (Doc. 17 at 48–49.) Plaintiffs do not rely on a single, initial decision from years earlier. Instead, they allege discrete acts of unjust enrichment occurring with each cash-sweep cycle and each month in which the Broker-Advisors retained allegedly-excessive sweep revenue. (Doc. 37 at 20.) Accepting these allegations as true, the complaint pleads multiple events occurring within the applicable limitations periods. Accordingly, the unjust-enrichment claims are timely to the extent they are based on enrichment occurring within the applicable limitations periods.

1

2      ii.   **Merits**

3            When a valid and enforceable contract between the parties covers the dispute at

4      issue, a plaintiff cannot maintain an unjust-enrichment claim. *Trustpilot Damages LLC v.*

5      *Trustpilot, Inc.*, No. 21 Civ. 432, 2021 WL 2667029, at *9–10 (S.D.N.Y. June 29, 2021);

6      *Meaney v. Connecticut Hosp. Ass'n, Inc.*, 735 A.2d 813, 823 (Conn. 1999). Unjust

7      enrichment may be pleaded in the alternative only where there is genuine doubt as to the

8      existence or scope of a contract. *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 263

9      (2d Cir. 1999); *Standard Petroleum Co. v. Faugno Acquisition, LLC*, 191 A.3d 147, 161

10     (Conn. 2018).

11           Here, the parties do not dispute that valid contracts governed the advisory and non-

12     advisory accounts. But the parties do dispute the scope of the contracts, particularly

13     whether the contracts required the Broker-Advisors to periodically review and set

14     "reasonable" sweep payment rates. Therefore, because the scope of the contract is at issue,

       unjust enrichment may be pleaded in the alternative.

15           But plaintiffs fail to allege facts to support unjust-enrichment claims. Specifically,

16     they fail to show why equity and good conscience require restitution be made, *see Beth*

17     *Israel*, 448 F.3d at 586, or why the Broker-Advisors unjustly did not pay to the detriment

18     of plaintiffs. *See Vertex, Inc.*, 898 A.2d at 190. Plaintiffs make several short and conclusory

19     allegations to support their unjust-enrichment theory (Docs. 17 at 48–49; 37 at 49), but

20     these allegations are insufficient under New York and Connecticut law. *See DeBlasio*, 2009

21     WL 2242605, at *40; *see also Caires v. JP Morgan Chase Bank, N.A.*, 880 F. Supp. 2d

22     288, 310–11 (D. Conn. 2012). Accordingly, the unjust-enrichment claims are dismissed.

23     **D. Investment Advisers Act**

24           Plaintiffs argue the Osaic Broker-Advisors violated the IAA and seek rescission of

25     their account agreements and restitution for consideration given pursuant to the terms of

26     those agreements, citing 15 U.S.C. § 80b-6 and § 80b-15.[3] (Docs. 17 at 49; 37 at 45–46,

27     48.)

28     _____

       [3] The parties regularly refer to §§ 206 and 215 of the IAA. These sections are codified at
       15 U.S.C. § 80b-6 and 15 U.S.C. § 80b-15, respectively.

The IAA itself does not designate a statute of limitations. Claims under § 80b-15 are likely limited by the earlier of actual knowledge of the violation (one-year limitation) or notice of facts that would lead to knowledge with reasonable diligence (three-year limitation). *See Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1042 (2d Cir. 1992). An § 80b-15 claim accrues upon execution of the agreement. *See id.* Here, plaintiffs' agreements were executed at least nine years ago. Plaintiffs do not identify any new or independent § 80b-15 violations (such as a newly-added contractual term) within three years of filing. Therefore, the § 80b-15 rescission claims are untimely.

Although plaintiffs also make arguments under § 80b-6, the IAA confers no private causes of action other than voiding an investment advisor's contract under § 80b-15. *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 11–12 (1979); *NexPoint Diversified Real Est. Tr. v. Acis Cap. Mgmt., L.P.*, 80 F.4th 413, 418 (2d Cir. 2023); *see also In re LPL Fin. Cash Sweep Litig.*, 789 F. Supp. 3d 961, 988 (S.D. Cal. 2025) (dismissing similar IAA claims in a cash sweep action). Because the alleged violations under § 80b-15 are untimely and no other private causes of action exist under the IAA, all IAA claims are dismissed.

## V.    Leave to Amend

A court should freely grant leave to amend unless the pleading could not possibly be cured by alleging other facts. *See Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000); Fed. R. Civ. P. 15(a)(2). Here, the allegation of other facts could possibly cure the claims against Osaic, Inc. and the fiduciary-duty claims against Osaic Wealth and Osaic Institutions and the unjust-enrichment claims. These claims are therefore dismissed with leave to amend. Out of an abundance of caution, the IAA claims are also dismissed with leave to amend on the chance plaintiffs can identify new contractual terms affecting the sweep program structure that were added within the limitations period.

## VI.    Case Management Report

Plaintiffs have stated plausible claims for relief such that the parties must confer and prepare a Rule 26(f) Joint Case Management Report. Discovery will commence on those

claims not dismissed by this order, even if plaintiffs choose to file an amended complaint.

Accordingly,

**IT IS ORDERED** the Motion to Dismiss (Doc. 28) is **GRANTED**.

**IT IS FURTHER ORDERED** the Motions to Dismiss (Docs. 29, 30) are **GRANTED IN PART** and **DENIED IN PART** as set forth above.

**IT IS FURTHER ORDERED** if plaintiffs wish to file an amended complaint they must file their amended complaint no later than **February 16, 2026**. If no amended complaint is filed, defendants shall answer the current complaint no later than **February 20, 2026**. If an amended complaint is filed, defendants shall respond by the deadline established by Rule 12.

**IT IS FURTHER ORDERED** as follows:

The parties are directed to meet, confer, and develop a Rule 26(f) Joint Case Management Report, which must be filed **within 4 weeks of the date of this order**. It is the responsibility of plaintiff(s) to initiate the Rule 26(f) meeting and prepare the Joint Case Management Report. Defendant(s) shall promptly and cooperatively participate in the Rule 26(f) meeting and assist in preparation of the Joint Case Management Report.

The Joint Case Management Report shall contain the following information in separately-numbered paragraphs.

1.  The parties who attended the Rule 26(f) meeting and assisted in developing the Joint Case Management Report;

2.  A list of all parties in the case, including any parent corporations or entities (for recusal purposes);

3.  Any parties that have not been served and an explanation of why they have not been served, and any parties that have been served but have not answered or otherwise appeared;

4.  A statement of whether any party expects to add additional parties to the case or otherwise amend pleadings;

5.  The names of any parties not subject to the court's personal (or *in rem*)

jurisdiction;

6.  A description of the basis for the court's subject matter jurisdiction, citing specific jurisdictional statutes. If jurisdiction is based on diversity of citizenship, the report shall include a statement of the citizenship of every party and a description of the amount in dispute. *See* 28 U.S.C. § 1332;

7.  A short statement of the nature of the case (no more than three pages), including a description of each claim, defense, and affirmative defense;

8.  A listing of contemplated motions and a statement of the issues to be decided by those motions;

9.  Whether the case is suitable for reassignment to a United States Magistrate Judge for all purposes or suitable for referral to a United States Magistrate Judge for a settlement conference;

10. The status of any related cases pending before this or other courts;

11. A discussion of any issues relating to preservation, disclosure, or discovery of electronically stored information ("ESI"), including the parties' preservation of ESI and the form or forms in which it will be produced;

12. A discussion of any issues relating to claims of privilege or work product;

13. A discussion of necessary discovery, which should take into account the December 1, 2015 amendments to Rule 26(b)(1) and should include:

    a.  The extent, nature, and location of discovery anticipated by the parties and why it is proportional to the needs of the case;

    b.  Suggested changes, if any, to the discovery limitations imposed by the Federal Rules of Civil Procedure;

    c.  The number of hours permitted for each deposition. The parties also should consider whether a total number of deposition hours should be set in the case, such as twenty total hours for plaintiffs and twenty total hours for defendants. Such overall time limits have the advantage of providing an incentive for each side to be as efficient as possible in

each deposition, while also allowing parties to allocate time among witnesses depending on the importance and complexity of subjects to be covered with the witnesses;

14. Proposed deadlines for each of the following events. In proposing deadlines, the parties should keep in mind the Case Management Order will contain deadlines to govern this case and once the dates have been set the court will vary them only upon a showing of good cause. A request by counsel for extension of discovery deadlines in any case that has been pending more than two years must be accompanied by a certification stating the client is aware of and approves of the requested extension. The court does not consider settlement talks or the scheduling of mediations to constitute good cause for an extension. The parties must propose the following:

a. A deadline for the completion of fact discovery, which will also be the deadline for pretrial disclosures pursuant to Rule 26(a)(3). This deadline is the date by which all fact discovery must be *completed*. Discovery requests must be served and depositions noticed sufficiently in advance of this date to ensure reasonable completion by the deadline, including time to resolve discovery disputes. Absent extraordinary circumstances, the court will not entertain discovery disputes after this deadline;

b. Dates for full and complete expert disclosures and rebuttal expert disclosures, if any;

c. A deadline for completion of all expert depositions;

d. A date by which any Rule 35 physical or mental examination will be noticed if such an examination is required by any issues in the case;

e. A deadline for filing dispositive motions;

f. Case-specific deadlines and dates, such as the deadline to file a motion for class certification or a date on which the parties are available for a

- 21 -

*Markman* (patent claim construction) hearing;

      g.     A date by which the parties shall have engaged in face-to-face good faith settlement talks;

      h.     Whether a jury trial has been requested and whether the request for a jury trial is contested, setting forth the reasons if the request is contested;

      i.     Any other matters that will aid the court and parties in resolving this case in a just, speedy, and inexpensive manner as required by Federal Rule of Civil Procedure 1;

15.     A statement indicating whether the parties would prefer that the court hold a case management conference before issuing a scheduling order—and, if so, an explanation of why the conference would be helpful.

**IT IS FURTHER ORDERED** the parties shall file a proposed Case Management Order containing all the proposed dates at the same time they file the Rule 26(f) Case Management Report. The proposed Case Management Order must also be emailed in Word format to Lanham_Chambers@azd.uscourts.gov.

Dated this 30th day of January, 2026.


**Honorable Krissa M. Lanham**
**United States District Judge**

- 22 -