Adam J. Levitt (Bar No. 5126602)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com

Alexander E. Barnett (admitted *pro hac vice*)
Jarett N. Sena (admitted *pro hac vice*)
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel.: (646) 933-1000
abarnett@dicellolevitt.com
jsena@dicellolevitt.com

*Counsel for Plaintiffs and the Proposed Class*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Robert Gehring, Harold Hunt, and Jeana Norris, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>American Portfolios Advisors, Inc., Osaic, Inc., Osaic Institutions, Inc., and Osaic Wealth, Inc.<br><br>Defendants. | Case No. No. 2:25-cv-00367-KML<br><br>SECOND AMENDED COMPLAINT<br><br>DEMAND FOR JURY TRIAL |

## Table of Contents

I. INTRODUCTION ........ 1
II. JURISDICTION AND VENUE ........ 3
III. PARTIES ........ 3
A. Plaintiffs ........ 3
B. Defendants ........ 4
C. Relevant Non-Parties ........ 5
IV. FACTUAL BACKGROUND ........ 6
A. Background on Osaic ........ 6
1. Growth and Acquisitions ........ 6
2. Consolidation and Integration ........ 8
B. Defendants' Duties to Their Clients ........ 8
1. Defendants Acting as Investment Advisers Owe Fiduciary Duties to Their Clients ........ 8
2. Defendants as Broker-Dealers Owe Duties to Act in the Best Interests of Their Clients ........ 10
3. Defendants' Duties to Secure a Reasonable Rate of Interest in IRA Accounts ........ 12
4. Defendants Are Contractually Obligated to Act in the Clients' Best Interest and Pay a Reasonable Rate of Interest ........ 13
5. The Osaic Defendants' Code of Ethics ........ 16
C. Defendants' Cash Sweep Programs ........ 17
1. The AP Cash Sweep Program ........ 18
2. Osaic's Cash Sweep Program ........ 19
3. Osaic Exercised De Facto Control over the Cash Sweep Programs ........ 22
D. Defendants Breached Their Fiduciary Duties and Contractual Obligations ........ 26
1. The Federal Funds Rate ........ 28
2. Interest on Short-Term U.S. Treasury Bills ........ 29

3. Money Market Rates, Including Those Offered by Osaic ............... 30

4. Other Institutions' Cash Sweep Account Interest Rates .................. 30

5. The Interest Rate Applicable to Short-term Instruments, Such as Repurchase Agreements ........................................................... 31

E. The Cash Sweep Programs Unfairly Benefit the Defendants ..................... 31

1. Defendants' Fees Under the Bank Deposit Sweep Program ........... 34

2. Defendants' Fees Under the AP Cash Sweep Program and Insured Cash Account Program ...................................................... 36

3. Osaic Reaps Substantial Profits at the Expense of its Customers........................................................................................ 39

V. CLASS ACTION ALLEGATIONS.................................................................. 40

VI. CLAIMS ALLEGED ........................................................................................ 43

VII. REQUEST FOR RELIEF.................................................................................. 49

VIII. DEMAND FOR JURY TRIAL......................................................................... 50

Plaintiffs Robert Gehring, Harold Hunt, and Jeana Norris ("Plaintiffs"), by their undersigned counsel, individually and on behalf of all members of the below-defined class (the "Class"), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this action against American Portfolios Advisors, Inc., Osaic, Inc., Osaic Institutions, Inc., and Osaic Wealth, Inc. (collectively, "Defendants" or the "Osaic Defendants").

## I. INTRODUCTION

1. This is a class action that arises out of the Osaic Defendants' dramatic under-payment of interest to their own customers in their cash sweeps programs (the "Cash Sweep Programs"). As explained below, the Osaic Defendants have underpaid their customers in violation of their fiduciary duties in order to enrich themselves at their customers' expense. In engineering the Cash Sweep Programs, the Osaic Defendants have breached and continue to breach their fiduciary obligations by putting their own best interests ahead of their clients.

2. In a typical cash sweep program, the uninvested cash balance from a customer's account is transferred into an interest-bearing account that generates returns for the client, consistent with market-based factors. The Osaic Defendants, however, have structured their Cash Sweep Programs to ensure that they, in partnership with a network of banks and clearing firms, divert the outsized returns to themselves.

3. The Cash Sweep Programs operate as follows. The Osaic Defendants take money out of their client accounts and give it to a list of selected banks to invest or loan out (the "Program Banks" or "Participating Banks"). The Osaic Defendants and the Program Banks then reap the interest that the banks earn by investing or loaning their clients' money to third parties. Only a fraction of that interest is paid out to the Osaic Defendants' actual clients. Instead, the Osaic Defendants and the Program Banks keep the "spread" or the difference between the market rates of interest the Program Banks earn on their loans and investments and the rates paid out to the clients. At all relevant times, the rate of interest that the Osaic Defendants earn on their customers' cash has been

significantly higher than what they paid out to clients. In fact, the rate of interest Defendants have kept for themselves was as high as ***five to 21 times the rate paid to customers*** during the relevant period. While remarkably profitable for Defendants, the Cash Sweep Programs violate common law, federal law, and industry regulations, including Defendants' fiduciary and contractual obligations to their clients.

4. During the rising interest rate environment from March 2022 through the present, the profits that the Osaic Defendants have earned on their customers' cash have grown exponentially. Rising interest rates should have presented an opportunity for Osaic's customers to earn more on their uninvested cash. However, Defendants continue to exploit this opportunity for their own benefit, extracting the high rates of interest for themselves and thwarting their customers from receiving the reasonable returns they were legally entitled to. Defendants disguise the returns they keep as "fees" for administering the Cash Sweep Programs. However, in reality, they receive kickbacks from the Program Banks on the profits they are able to obtain by investing or loaning out customers' cash at significantly higher rates of interest. By improperly keeping the interest rates paid on the cash sweep accounts low and sharing the interest profit with the Program Banks, Defendants align themselves with the banks to maximize their own profits, rather than the customers to which they owe fiduciary duties.

5. Similar cash sweep practices have drawn scrutiny from the SEC and resulted in tens of millions of dollars in fines. According to a January 17, 2025 announcement, the SEC fined Wells Fargo Advisors and Merrill Lynch a combined $60 million for failing to pay advisory customers a fair rate on cash sweeps. Wells Fargo agreed to pay $35 million, including $7 million tied to violations at its independent Financial Network channel. Merrill paid a civil penalty of $25 million. As the Osaic Defendants have done, Wells Fargo and Merrill Lynch automatically swept customer cash to a bank deposit program with yields that were as much as 4% lower than reasonable alternatives.

6. Osaic Defendants' misconduct constitutes an ongoing series of breaches of their fiduciary duties and contractual obligations, which require the Osaic Defendants to

act in the best interests of their clients, and not themselves. Plaintiffs, individually and on behalf of the other Class members, hereby bring this class action to remedy the significant financial harm caused by the Osaic Defendants' use of the Cash Sweep Programs to enrich themselves at the cost of their own clients.

## II. JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. §1332(d)(2), as amended by the Class Action Fairness Act of 2005. There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, and at least one or more members of the proposed Class is a citizen of a different state than at least one Defendant.

8. The Court has personal jurisdiction and venue over Defendants because the Osaic Defendants have their principal place of business, regularly transact business here and/or caused harm to persons and entities in this District.

9. Venue is also proper in this District under 28 U.S.C. §1391(b) because a substantial part of the events and/or relevant conduct giving rise to the claims at issue occurred in this District and because Defendants are subject to the personal jurisdiction of this Court.

## III. PARTIES

### A. Plaintiffs

10. Plaintiff Robert Gehring is a citizen of New Hampshire, who maintained accounts at American Portfolios companies and their successor-in-interest Osaic Wealth, including an investment advisory IRA and a non-advisory IRA. Mr. Gehring's cash balances in his American Portfolios and Osaic accounts, were at times, automatically "swept" into the Cash Sweep Programs and he received unreasonably low interest on those deposits.

11. Plaintiff Harold Hunt is a citizen of Tennessee, who maintained a self-directed or non-advisory individual retirement account ("IRA") at Infinex Financial Group

and its successor-in-interest Osaic Institutions, Inc. Mr. Hunt's cash balances in his Osaic account, were at times, automatically "swept" into the Cash Sweep Programs and he received unreasonably low interest on those deposits.

12. Plaintiff Jeana Norris is a citizen of Tennessee, who maintains a self-directed or non-advisory IRA at Infinex Financial Group and its successor-in-interest Osaic Institutions, Inc. Ms. Norris' cash balances in her Osaic account, were at times, automatically "swept" into the Cash Sweep Programs and she received unreasonably low interest on those deposits.

**B. Defendants**

13. American Portfolios Advisors, Inc. ("APA" or "American Portfolios Advisors") was formerly registered with the SEC as an investment adviser. APA offered personalized investment advisory services to individuals, pension and profit-sharing plans, trusts, estates, charitable organizations, corporations, and other business entities. APA is a Delaware corporation with its principal place of business in Holbrook, New York. APA was a wholly-owned subsidiary of American Portfolios Holdings, Inc. ("APH") and an affiliate of American Portfolios Financial Services ("APFS"). As an affiliate of APFS, APA would recommend that advisory clients establish accounts through APFS for trade execution and account service.

14. Osaic, Inc., doing business as Osaic and formerly known as Advisor Group Holdings, Inc., ("Advisor Group") a portfolio company of Reverence Capital Partners, is one of the nation's largest providers of wealth management solutions, supporting approximately 11,000 financial professionals. Advisor Group acquired APH, including investment adviser APA and broker-dealer APFS in June 2022 and changed its name to Osaic in June 2023. Osaic, Inc. is a Maryland corporation with its principal place of business in Phoenix, Arizona and a wholly-owned subsidiary of Osaic Holdings, Inc. As discussed below, Osaic, Inc., along with Osaic Wealth and Osaic Institutions, operates, manages, and runs the Cash Sweep Programs.

15. Osaic Institutions, Inc. ("Osaic Institutions") is registered with SEC as an investment adviser and broker-dealer is a member of Financial Industry Regulatory Authority ("FINRA"). Osaic Institutions is owned by Osaic Institutions Financial Holdings, Inc., which was acquired by Osaic Holdings, Inc. on October 3, 2022. Osaic Institutions is a Connecticut corporation headquartered in Meriden, Connecticut.

16. Osaic Wealth, Inc. ("Osaic Wealth") is registered with the SEC as a broker-dealer and investment adviser, and is a member of FINRA. Osaic Wealth is a subsidiary of Osaic, Inc., a wholly-owned subsidiary of Osaic Holdings, Inc. It is a Delaware corporation with its principal place of business in Scottsdale, Arizona. Osaic Wealth is the successor-in-interest of APFS.

17. Osaic, Inc., Osaic Institutions, and Osaic Wealth are collectively referred to herein as "Osaic."

**C. Relevant Non-Parties**

18. APH operated as the holding company through which its subsidiaries, including APA and APFS provided financial services. It was a Delaware corporation with its principal place of business in Holbrook, New York. In 2022, APH was acquired by Advisor Group, now known as Osaic.

19. APFS was a registered broker-dealer that was wholly owned by APH and an affiliate of APA. APH, APFS, and APA (together, "American Portfolios") were acquired by Osaic on or around June 22, 2022. American Portfolios was subsequently integrated and consolidated into Osaic's subsidiary Osaic Wealth.

20. Infinex Financial Group ("Infinex") was an independent broker-dealer focused on serving the investment, insurance and wealth management needs of financial institutions, and wholly owned subsidiary of Infinex Financial Holdings, Inc. Infinex was acquired by Osaic in 2022, and subsequently integrated and consolidated into Osaic Institutions.

## IV. FACTUAL BACKGROUND

### A. Background on Osaic

21. Osaic is one of the nation's largest providers of wealth management solutions, with approximately 11,600 financial professionals managing more than $700 billion in assets.

22. At the core of Osaic's business model is its network of financial professionals consisting of investment advisors and broker-dealers that it has amassed through numerous acquisitions over the years.

23. During the relevant time period, Osaic offered brokerage and investment advisory services to customers nationwide. These customers were subject to Osaic's cash sweep programs.

#### 1. Growth and Acquisitions

24. Osaic's history traces back to SunAmerica Inc., a financial services company founded in Baltimore, Maryland to assist clients with financial and retirement planning. SunAmerica, Inc. was thereafter acquired by global insurance and financial services firm, American International Group ("AIG"), and then in 2002, AIG Advisor Group was formed.

25. In 2016, Lightyear Capital LLC and PSP Investments acquired AIG Advisor Group and its subsidiaries, including its firms FSC Securities Corp., Royal Alliance Associates Inc., SagePoint Financial Inc., and Woodbury Financial Service, forming Advisor Group.

26. In 2019, Reverence Capital Partners, a private equity firm, announced its acquisition of Advisor Group from Lightyear Capital LLC and PSP Investments for $2.3 billion and a 75% stake. Lightyear Capital, PSP Investments, and all other shareholders maintained up to a 25% share of Advisor Group.

27. In February 2020, Advisor Group acquired Ladenburg Thalmann Financial ("LTF") to become the second largest broker-dealer in America. The acquisition included LTF's independent broker-dealer firms: Securities America, Inc., Securities Service Network, LLC, lnvestacorp, Inc.; Triad Advisors, LLC and KMS Financial Services, Inc.;

their affiliated investment adviser firms Securities America Advisors, Inc., Arbor Point Advisors, LLC, SSN Advisory, Inc., lnvestacorp Advisory Services, Inc., and Triad Hybrid Solutions, LLC; as well as Premier Trust, Inc., Ladenburg Thalmann Asset Management Inc., and Highland Capital Brokerage, Inc.

28. In May 2022, Advisor Group announced an acquisition of institution-focused broker-dealer Infinex Financial Holdings, Inc.

29. In June 2022, Advisor Group continued its strategic growth with the announcement of an acquisition of APH, which owns both broker-dealer American Portfolios Financial Services and investment adviser American Portfolios Advisors. Advisor Group's acquisition of American Portfolios closed in November 2022. With this acquisition, "[n]early all, 98%, of the more than 850 financial professionals in nearly 400 American Portfolios branches across the country transitioned to the Advisor Group network."[1]

30. The acquisition of APH as a whole was acknowledged by APA in its Form ADV Part2A Disclosure Brochure, dated March 30, 2023:

> APA is a wholly owned subsidiary of American Portfolios Holdings, Inc. ("APH"). In addition to APA, APH also owns American Portfolios Financial Services. Inc (APFS) a registered broker-dealer. ***On November 1, 2022, APH was acquired by Advisor Group Holdings, Inc.*** ("AGHI").

31. In December 2023, Osaic announced a definitive agreement to acquire Lincoln Financial Advisors Corporation and Lincoln Financial Securities Corporation, which was completed in May 2024.

[1] Press Release, NASDAQ, Advisor Group Closes Acquisition of American Portfolios Financial Services Inc. (Nov. 14, 2022) (https://www.nasdaq.com/press-release/advisor-group-closes-acquisition-of-american-portfolios-financial-services-inc.-2022#:~:text=Nearly%20all%2C%2098%25%2C%20of,to%20the%20Advisor%20Group%20network). All emphasis is added unless otherwise stated.

### 2. Consolidation and Integration

32. In June 2023, Advisor Group announced it would be known as Osaic as part of a multi-month strategy to rebrand its subsidiary firms into one cohesive entity.

33. As part of the rebrand, each of the wealth management firms previously under Advisor Group transitioned into Osaic beginning in the fall of 2023. By October 2024, Dimple Shah, Osaic's Head of Advisor Growth and Platform Solutions, reported that 90% of its consolidation process, which Osaic calls its "Journey to One," had been complete. The firms acquired by Osaic in 2022 have been integrated and consolidated into Osaic's various subsidiaries. For instance, APFS's assets have been integrated and consolidated into Osaic Wealth.

34. By bringing all eight of its wealth management firms together under one brand, Osaic stated it "will be better positioned to serve its financial professionals by offering them access to the full breadth of capabilities and expertise that the firm's growing scale provides."

## B. Defendants' Duties to Their Clients

### 1. Defendants Acting as Investment Advisers Owe Fiduciary Duties to Their Clients

35. Osaic offers investment advisory services to retail or individual customers through its subsidiaries, including Osaic Wealth, Inc., which are SEC-registered investment advisers.

36. Osaic Wealth is registered as an investment adviser with the SEC, SEC File No. 801-54859, in order to offer investment advisory products and services to its advisory clients.

37. APA was also registered with the SEC File No. 801-61065 while it was providing investment advice to Plaintiff Robert Gehring.

38. Under the Investment Advisers Act of 1940 (the "Advisers Act" or the "1940 Act"), Osaic Wealth and APA (the "Investment Adviser Defendants") owed fiduciary duties to Plaintiffs and the proposed class, as Osaic Wealth acknowledges:

> When providing advisory services, ***we are held to a fiduciary standard that covers our investment advisory relationship with you***. As fiduciaries, investment advisors are required to act in the best interest of their clients and not place their own interests ahead of their clients.[2]

39. Osaic and APA manage investment advisory accounts on either a discretionary or non-discretionary basis, which are subject to the Cash Sweep Programs. In providing discretionary advisory services, the Investment Adviser Defendants make the decision regarding the purchase or sale of investments without the client's approval as to each transaction. In contrast, when providing non-discretionary services, Osaic, "may recommend investments for your account, but the ultimate decisions regarding what you buy or sell are yours."

40. Investment advisers such as Osaic and APA were or still are fiduciaries under the 1940 Act during the relevant period. *See SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 194 (1963); *see also* Sec. and Exch. Comm'n Interpretation Regarding Standard of Conduct for Inv. Advisers, Securities Act Release No. 5248, Investment Company Act No. 5248, 2019 WL 3779889, at *1 (June 5, 2019) ("Under federal law, an investment adviser is a fiduciary.").

41. The investment adviser's fiduciary duty "is broad and applies to the entire adviser-client relationship." This fiduciary duty is "based on equitable common law principles and is fundamental to advisers' relationships with their clients under the Advisers Act." *Id*. at *2.

42. The fiduciary duty an investment adviser owes to its client under the 1940 Act specifically encompasses a duty of care and duty of loyalty.

43. As the SEC has stated, "[t]his means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. In other words,

---

[2] Form CRS: Customer Relationship Summary, OSAIC (2023), https://files.brokercheck.finra.org/crs_23131.pdf.

the investment adviser cannot place its own interests ahead of the interests of its client." *Id.* at *3.

44. Under an investment adviser's duty of loyalty, "an investment adviser must eliminate or make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict." *Id.* at *3, *8.

45. However, in certain situations disclosure is simply not sufficient, and "[f]or retail clients in particular, it may be difficult to provide disclosure regarding complex or extensive conflicts that is sufficiently specific, but also understandable." Where an investment advisor such as Osaic "cannot fully and fairly disclose a conflict of interest to a client such that the client can provide informed consent," then it "should either *eliminate* the conflict or adequately *mitigate* (i.e., modify practices to reduce) the conflict such that full and fair disclosure and informed consent are possible." (Emphasis in original). *Id.* at *9.

46. The investment adviser's duty of care includes among other things: "(i) the duty to provide advice that is in the best interest of the client, (ii) the duty to seek best execution of a client's transactions where the adviser has the responsibility to select broker-dealers to execute client trades, and (iii) the duty to provide advice and monitoring over the course of the relationship." *Id.* at *4.

**2. Defendants as Broker-Dealers Owe Duties to Act in the Best Interests of Their Clients**

47. Substantially similar duties under the Investment Advisers Act are imposed on Osaic under broker-dealer law. Assuming that Osaic is not acting as an investment adviser but instead in its capacity as a broker-dealer, Osaic is obligated to act in its clients' best interests under Regulation Best Interest: The Broker-Dealer Standard of Conduct, 84 Fed. Reg. 33381-01 (July 12, 2014) ("Reg BI"). *See* 17 C.F.R. §240.151-1.

48. Although the specific application of Reg BI and the fiduciary standard under the 1940 Act may differ in some respects, "they generally yield substantially similar results in terms of the ultimate responsibilities owed to retail investors."[3]

49. Under Reg BI, "a broker-dealer must act in the retail customer's best interest and cannot place its own interests ahead of the customer's interests" when making a recommendation to retail clients. 84 Fed. Reg. at 33320.

50. Over the past several years, the SEC has repeatedly highlighted the conflicts of interest financial institutions must appropriately manage under Reg BI. Per the SEC's guidance, "[u]nder ***both Reg BI and the IA fiduciary standard***," broker-dealers and investment advisers "may recommend an account to a retail investor only when [they] have a reasonable basis to believe that the account is in the retail investor's best interest."

51. Among other things, under Regulation Best Interest, broker-dealers like Osaic must "consider reasonable alternatives, if any, offered by the broker-dealer in determining whether it has a reasonable basis for making the recommendation," 84 Fed. Reg. 33318, 33321. This includes making recommendations in the client's best interest with respect to particular cash sweep programs.

52. When placing clients' cash into a cash sweep program, Osaic's obligations with respect to making recommendations in accordance with Regulation Best Interest are underscored by an August 2023 SEC Staff Bulletin—Standards of Conduct for Broker-Dealer and Investment Advisers Account Recommendations for Retail Investors.

53. In the Staff Bulletin, the SEC called out the operation of cash sweep programs in two separate instances as examples of a conflict of interest for broker-dealers and investment advisers, alongside practices such as commissions, markups, revenue sharing and payment for order flow, which are governed by Regulation Best Interest. As the SEC highlighted, broker-dealers are obligated to act in a "retail investor's best interest

---

[3] *See* SEC Staff Bulletin: Standards of Conduct for Broker-Dealers and Investment Advisers Care Obligations, SEC (last updated Apr. 30, 2024), www.sec.gov/tm/standards-conduct-broker-dealers-and-investment-advisers.

and not to place their own interests ahead of the investor's interest"; can "recommend an account to a retail investor only when you have a reasonable basis to believe that the account is in the retail investor's best interest"; "cannot recommend an account that is not in a retail investor's best interest solely based on your firm's limited product menu"; "[a]ny limitations on account types considered . . . are material facts that should be disclosed"; and must disclose any compensation they receive on the basis of their cash sweep programs.

54. In its account agreements, brochures, forms and other documents, Osaic repeatedly acknowledges its obligations to comply with Regulation Best Interest and to "act in the best interest of a retail customer("you") and, and place your interests ahead of all others when making a recommendation."

**3. Defendants' Duties to Secure a Reasonable Rate of Interest in IRA Accounts**

55. Defendants also have a duty to secure a reasonable rate of interest for clients' uninvested cash in IRAs. The requirement to pay a reasonable rate of interest derives from the Internal Revenue Code ("IRC").

56. Section 4975 of the IRC taxes "prohibited transactions," including when a plan sponsor for an IRA engages in transactions with a "disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account." 26 U.S.C. §4975(c)(1)(E).

57. To provide further clarification on distributions of IRAs, the U.S. Internal Revenue Service ("IRS") explains in Publication 590 that "[g]enerally, a prohibited transaction is any improper use of your traditional IRA account or annuity by you, your beneficiary, or any disqualified person."

58. A "disqualified person" includes those "providing services to the plan." 26 U.S.C. §4975(e)(2)(B). This includes financial institutions that hold client assets and advisory firms that determine which bank will hold those assets, such as Osaic and APA. As IRS Publication 590 explains, "[d]isqualified persons include your fiduciary," such as

anyone who "[e]xercises any discretionary authority or discretionary control in managing your IRA or exercises any authority or control in managing or disposing of its assets."

59. Therefore, under the IRC, the Osaic Defendants were "disqualified person[s]" and cash sweeps from IRA accounts were "prohibited transactions."

60. IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions." One safe harbor to the taxation of prohibited transactions is "the investment of all or part of a plan's assets in deposits ***which bear a reasonable interest rate*** in a bank or similar financial institution." 26 U.S.C. §4975(d)(4).

61. The U.S. Treasury regulations include a similar requirement where financial institutions such as Osaic and APFS "invest[] plan assets in deposits in itself or its affiliates." 26 C.F.R. §54.4975-6(b)(3)(i). In such circumstances, the parties' agreement "must name" the bank and "***must state*** that such bank or similar financial institution may make investments in deposits which ***bear a reasonable rate of interest*** in itself (or in an affiliate)." *Id.*

62. In sum, federal law requires that the Osaic Defendants pay their clients a reasonable rate of interest, and Defendants violated those laws by failing to do so on clients' swept cash.

### 4. Defendants Are Contractually Obligated to Act in the Clients' Best Interest and Pay a Reasonable Rate of Interest

63. Upon opening a new account with Osaic, each customer is provided with standardized contractual documents (the "Account Agreements"), which incorporate among other things, the Osaic Cash Sweep Program Documents.

64. Osaic Wealth and Osaic Institutions' Form Client Relationship Summary ("Form CRS") also are part of the overall contracts with clients. For example, following the acquisition of Infinex by Osaic, existing accountholders received Osaic Institutions' Form CRS.

65. Osaic Wealth and Osaic Institutions' Form CRS expressly contracts with customers, promising a duty to act in their clients' best interests, consistent with its duties imposed under the 1940 Act, Regulation Best Interest and the IRC:

Osaic Wealth

***Brokerage Services***

> One of our obligations to you when providing brokerage services is that ***we must act in your best interest and not place our interests ahead of yours when we recommend an investment or an investment strategy involving securities***. Additionally, when we provide any service to you, we must treat you fairly and comply with a number of specific obligations.

***Advisory Services***

> When providing advisory services, we are held to a fiduciary standard that covers our investment advisory relationship with you. ***As fiduciaries, investment advisors are required to act in the best interest of their clients and not place their own interests ahead of their clients***.

Osaic Institutions

> When we provide you with a recommendation as your broker-dealer or act as your investment advisor, we have to act in your best interest and not put our interest ahead of yours.

66. Osaic Wealth further acknowledges its duty to act in its clients' best interest under Reg BI in its Broker Dealer Firm Brochure:

> Regulation Best Interest ("Reg BI") requires broker-dealers and their Financial Professionals to act in the best interest of a retail customer* ("you"), and place your interests ahead of all others when making a recommendation of any securities transaction or investment strategy involving securities, including account recommendations and rollover/transfer of assets.

67. While Osaic was required to act in the clients' best interest, at the same time, it harbored under conflicts of interest, which it was required to mitigate or eliminate

altogether. As Osaic Institutions and Osaic Wealth both acknowledge in their Form CRS, Osaic's interests "can conflict" with its clients' interests, and that "[w]hen we provide recommendations, we must eliminate, mitigate or inform you of these conflicts, depending on the nature of the conflict." Osaic Institutions and Osaic Wealth are supposed to "maintains[] policies and procedures to ensure recommendations made to you are in your best interest," and thereby mitigate conflicts of interest.

68. Despite the promises made to clients, Osaic did not mitigate conflicts of interest arising from the cash sweep services discussed herein, but rather, profited off of those activities, to the direct detriment of the clients they were required to protect.

69. Further, Osaic also contractually promised in its Cash Sweep Documents that it would, in consultation with its "Cash Review Committee," periodically "review" and "adjust" interest rates based on economic conditions:

> ***We will periodically adjust interest rates*** and the interest rate tiers based on a number of factors, ***including general economic, market and business conditions***.

70. The Osaic Defendants' contractual agreements also reinforce their obligation to provide reasonable rates of return on their customers' cash balances for IRAs. In a document titled "Our Role and Fiduciary Acknowledgment for Retirement Accounts," (the "Fiduciary Acknowledgement") Osaic Wealth sets forth the fiduciary duties it owes to retirement accountholders.

71. In the Fiduciary Acknowledgement, the Osaic Defendants specifically recognize that when they provide investment advice to IRA accountholders, they are fiduciaries under applicable laws:

> <u>American Portfolios</u>
>
> *Fiduciary Acknowledgement*
> When American Portfolios provides investment advice, as defined by the Department of Labor, to you regarding your retirement plan account or individual retirement account (IRA) under ERISA, ***American Portfolios is a fiduciary within the meaning of Title I of the Employee Retirement Income***

> ***Security Act and/or the Internal Revenue Code, as applicable, which are laws governing retirement accounts***.
>
> <u>Osaic</u>
>
> *Fiduciary Acknowledgment*
> When the Firm and your financial professional provide "investment advice" within the meaning of Title 1 of the Employee Retirement Income Security Act and/or the Internal Revenue Code ("Retirement Laws") to you regarding your retirement plan account or individual retirement account ("Retirement Account(s)"), ***we are fiduciaries under the Retirement Laws with respect to such investment advice***.[4]

72. The Osaic Defendants add that with respect to IRAs "[t]he way we make money creates certain conflicts with your interest, ***so we operate under a special rule that requires us to act in your best interest and not put our interests ahead of yours***." Under these requirements, Osaic provides that it must:

- Meet a professional standard of care (give prudent advice);
- ***Not put our financial interests ahead of yours***;
- Avoid misleading statements about our conflicts of interest, fees, and investments;
- Follow policies and procedures designed to ensure that we give advice that is in your best interest;
- ***Charge no more than what is reasonable for our services***; and
- Give you basic information about our conflicts of interest.

**5. The Osaic Defendants' Code of Ethics**

73. The Osaic Defendants' fiduciary duties to their customers are further reflected in their Code of Ethics (the "Code").[5] The Osaic Defendants were required to adopt the Code pursuant to Rule 204-1 of the 1940 Act, which "set[s] forth standards of conduct and require[s] compliance with federal securities laws."

---

[4] *See* Fiduciary Acknowledgment, OSAIC, https://assets.osaic.com/m/1c34c5d80cef0d5a/original/Fiduciary-Acknowledgement.pdf (last visited Apr. 16, 2025).

[5] *See* Code of Ethics, OSAIC (Aug 30, 2024), https://assets.osaic.com/m/5b81d3e5600ea3e1/original/Code-of-Ethics.pdf.

74. As Osaic acknowledges, it adopted the Code because "[t]he Firm has a fiduciary obligation to [its] clients." The Code "is intended to reflect and identify the fiduciary principles of honesty, integrity, and fairness that are to be consistently applied across the RIA firms and their dealings with clients."

75. The Code states that the "***[c]lients' interests must always come first***; they cannot be compromised."

76. Under the section titled "Our Fiduciary Obligation to Our Clients," the Code explains:

> Fiduciary responsibility should be thought of as the duty to place the interests of the Client before that of the person providing investment advice. Failure to do so may render the Firm or its Supervised Persons in violation of the anti- fraud provisions of the Advisers Act.

77. Further, Osaic "as a fiduciary, has an affirmative duty of care, loyalty, honesty, and good faith to act in the best interests of its clients." This fiduciary responsibility "also includes the duty to disclose material facts that might influence the Client's decision to purchase or refrain from purchasing a security recommended by the Firm or from engaging the Firm to manage the Client's investments."

78. As alleged herein, Osaic violated their own Code of Ethics by and through the Cash Sweep Programs, which enriched Osaic at the expense of its clients.

**C. Defendants' Cash Sweep Programs**

79. In a typical cash sweep account for an investment advisory account customer, the firm moves uninvested cash (*e.g.*, incoming cash deposits, dividends, or certain investment returns) from the customer's account to a money market mutual fund or a bank whose deposits are insured by the Federal Deposit Insurance Corporation ("FDIC"). Cash sweep accounts are intended to convert idle cash into interest-bearing investment vehicles.

80. Three types of client relationships employ the Cash Sweep Programs at issue here—brokerage accounts, investment advisory accounts, and IRA accounts. For each type, Osaic clients often have uninvested cash from a number of different sources. Rather

than allowing that cash to sit idle, Osaic's Cash Sweep Programs ostensibly allow clients to earn interest on that uninvested cash by "sweeping" (i.e., automatically transferring) such cash into a bank deposit account. At Osaic, each client relationship shared the same fundamental characteristics in which Osaic sweeps its clients' uninvested cash into its Cash Sweep Programs and paid unreasonably low rates of interest to those clients on the swept cash.

81. With all types of accounts, Osaic Wealth and Osaic Institutions' clients receive advice and recommendations from a "financial professional" ("Financial Professional" or "FP"), who offer brokerage services, investment advisory services, or both, depending on their registrations, including with respect to the Cash Sweep Programs.

82. For brokerage accounts, Osaic Wealth affirms in its Broker-Dealer Firm Brochure that "[s]ince your FP is a registered representative of a broker-dealer, your FP must comply with Regulation Best Interest and will take into consideration all types of accounts that could be offered when making the recommendation of an account that is in your best interest." This specifically includes making recommendations in the client's best interest with respect to the Cash Sweep Programs, which are identified on Page 17 of the Broker-Dealer Firm Brochure. For investment advisory accounts, Osaic's FPs "provide ongoing investment advice and monitoring service of your account(s) for a fee."

83. Thus, for each of the accounts discussed above, Osaic owes its clients fiduciary duties, including the duty to act in its clients' best interest, in engineering, offering, recommending enrolling, and maintaining cash sweep accounts under the Cash Sweep Programs.

### 1. The AP Cash Sweep Program

84. Prior to the acquisition by Osaic, APA and APFS operated cash sweep programs (the "AP Cash Sweep Programs"), whereby uninvested cash balances were automatically swept into FDIC deposit accounts at multiple banks, also known as the Participating Banks. The AP Cash Sweep Program operated in substantially similar ways to the Osaic Cash Sweep Programs.

85. The terms and conditions of the AP Cash Sweep Program were set forth in "American Portfolios FDIC Insured Bank Deposit Program Disclosure Statement" (the "AP Cash Sweep Document"), which was posted on American Portfolios' website.

86. As the AP Cash Sweep Document provides, customers were automatically enrolled and its uninvested cash balances automatically swept into the AP Cash Sweep Program by a matter of default upon the opening of customers' accounts:

> Upon opening your Account, your Account will automatically have the Bank Deposit Sweep Program established as the default cash sweep option.

87. Pershing LLC ("Pershing") acted as the "authorized agent" under the AP Cash Sweep Programs to "establish and maintain Deposit Accounts at various Participating Banks and to effect deposits to, withdrawals from and transfers between the deposit accounts at the various Participating Banks."

88. APFS and APA exercised control and discretion over the eligibility, terms, and conditions, as well as the parameters and characteristics of the AP Cash Sweep Program, including changing, modifying or deleting aspects of the program:

> Upon prior notice, APFS may change, add or delete the sweep options available in your Account, or the terms and conditions of its Bank Deposit Sweep Program. Furthermore, APFS may, upon prior notice to you, change the sweep option in which you participate from one option to another, including changes between money market funds and bank deposit sweep programs.

89. Following Osaic's acquisition of American Portfolios, clients who had opened accounts at American Portfolios continued to have their cash swept into low-interest bearing accounts, including under the Osaic Cash Sweep Programs.

**2. Osaic's Cash Sweep Program**

90. Under Osaic's Cash Sweep Programs, "cash balances . . . [are] transferred to a bank deposit sweep product, which allocates swept balances to participant banks whose deposits are insured by the Federal Deposit Insurance Corporation ('FDIC') up to

allowable limits and subject to certain conditions" (the "Osaic Cash Sweep Programs," and together with the AP Cash Sweep Program, the "Cash Sweep Programs").

91. Osaic refers to the uninvested cash eligible to be swept as "Free Credit Balance," *i.e.*, the credit balance that remains in a client's account "after all purchases are made and are free from withdrawal restrictions." A customer's free credit balance "generally originates from dividends, interest payments, and/ or security sales and may be used at any time to purchase more securities."

92. The Osaic Cash Sweep Programs are "offered by Osaic, Inc., through its affiliated Broker-Dealers Osaic Wealth, Inc., and Ladenburg Thalmann & Co" as well as Osaic Institutions. Osaic offers the same cash programs for its Osaic Wealth and Osaic Institutions clients, as the disclosure documents are identical.

93. Osaic, through its affiliated broker-dealer, offers cash sweep programs for accounts introduced to their two respective clearing firms: (1) Pershing and (2) National Financial Services LLC ("NFS"). Pershing and NFS (the "Clearing Firms") act as the customers' agents with respect to the programs. The Clearing Firms, respectively, are responsible for establishing the Deposit Accounts at each Program Bank, depositing cash into the Deposit Accounts, withdrawing cash from Deposit Accounts, and transferring cash between Deposit Accounts.

94. The clearing firm for the Osaic Cash Sweep Programs is selected based on where the customer's investment account is maintained. As with the AP Cash Sweep Programs, Pershing is appointed as the clearing firm for: "accounts introduced to" Pershing. Whereas NFS is appointed as the clearing firm for accounts "introduced by [Osaic] to and held by . . . NFS." Osaic Institutions accounts are custodied at Pershing, which acts as the clearing firm with respect to those accounts.

95. Osaic published two disclosure document for accounts introduced at NFS and Pershing, respectively: (1) "Sweep Program Disclosure Document: For accounts introduced to National Financial Services LLC" (the "NFS Cash Sweep Document") and (2) the "Sweep Program Disclosure Document: Pershing, LLC" (the "Pershing Cash Sweep

Document," and together with the NFS Cash Sweep Document and the AP Cash Sweep Document, the "Cash Sweep Program Documents.") The Cash Sweep Program Documents are incorporated into Osaic's contractual agreements.

96. Regardless of the clearing firm selected by Osaic, "free credit balances" were automatically swept pursuant to two deposit programs: (1) the Bank Deposit Sweep Program ("BDSP") and (2) the Insured Cash Account Program ("ICAP").

97. Osaic automatically enrolled clients into these respective Cash Sweep Programs upon the opening of clients' accounts ***and all subsequent and future accounts***. The clients' enrollment was automatic "unless or until" the client instructs otherwise, at which point "clients' cash deposits remain in 'Free Credit Balances' and will not earn interest nor be protected with FDIC insurance.":

> <u>NFS Cash Sweep Document</u>
>
> As stated in the Customer Agreement and unless or until you instruct us otherwise, by signing and returning the Account Application and Customer Agreement (hereafter, "Customer Agreement"), ***you are consenting to having your Brokerage Account, and all subsequent and future Brokerage Account(s) opened for you by us, be automatically included in the Sweep Program***. Upon executing (electronically or otherwise) the Customer Agreement, you appoint our clearing firm NFS as your agent to establish and maintain your sweep accounts.
>
> <u>Pershing Cash Sweep Document</u>
>
> By executing the Customer Agreement (electronically or otherwise), ***you are consenting to having your account, and all subsequent and future account(s) opened for you by us, be automatically included in the Sweep Program***. Your account(s) will automatically default to the corresponding sweep product indicated in the tables below. Upon executing the Customer Agreement, you appoint our clearing firm, Pershing, LLC ("Pershing") as your authorized agent to establish and maintain your sweep accounts.

Moreover, customers who had opened accounts at predecessors of Osaic were automatically placed into Osaic's Cash Sweep Programs after the acquisitions.

98. The BDSP has broad applicability. The BDSP operates as the "***default sweep product***" and "***primary core account investment vehicle***" made available to "[a]ll advisory and commission-based retail account types, and commission-based IRA's." The BDSP includes brokerage, investment advisory, and IRA accounts where the Osaic Defendants legally and contractually owes fiduciary duties to their clients, as described herein.

99. The Insured Cash Account Program operates as the "***default sweep product***" and "***primary core account investment vehicle***" made available to all advisory, fee-based IRA accounts ("Advisory IRAs"). Eligibility for ICAP is limited to Advisory IRA accounts, where an "advisory fee is charged" by Osaic or an affiliated investment adviser. Thus, the eligibility criteria for ICAP triggers Osaic's strict fiduciary duties as an investment adviser under the 1940 Act.

100. Despite different eligibility criteria, the BDSP and ICAP programs function largely the same. Pershing or NFS, as authorized agents, sweep the free credit balances into deposit accounts with one or more Program Banks listed on the applicable program bank list ("Program Bank List"). Like the Participating Banks under the AP Cash Sweep Program, the Program Banks are a network of banks selected by Defendants where cash gets swept into.

### 3. Osaic Exercised De Facto Control over the Cash Sweep Programs

101. Osaic's control over the design, structure, use and recommendation of the Cash Sweep Programs reinforces the existence of a fiduciary duty with respect to all accounts. Osaic made financial recommendations with respect to the cash swept, and its clients specifically trusted Osaic to operate the Cash Sweep Programs in their best interest.

102. Osaic exercises this control by: (i) automatically selecting and placing client funds into the respective Cash Sweep Programs; (ii) determining client eligibility in the Cash Sweep Programs; (iii) "establish[ing] and chang[ing] interest rates" set by the Program Banks; (iv) "determin[ing] the tier levels (if applicable) at which interest rates are

paid"; and (v) determining "the amount of fees received by [the Clearing Firms], Osaic Wealth, and any other service provider." [6]

103. Further, Osaic offered its clients recommendations on swept cash. As explained above, in making such investment recommendations Osaic owes fiduciary duties to its clients under Reg BI, the Investment Advisers Act, the Internal Revenue Code, and pursuant to its own contractual agreements.

**a. Eligibility**

104. The Cash Sweep Program Documents list the account types eligible for the program, specifically excluding "ERISA Title I accounts, Section 403(b)(7) accounts and Keogh Plans." Osaic also "retain[s] the right to revise this list of account types that are not eligible for the BDSP or ICAP, and to otherwise implement changes to our Sweep Program, upon advance notice to you."

105. "Other limitations" on eligibility are determined by Osaic and the Clearing Firms with Osaic and the Clearing Firms retaining "the right to modify the eligibility for the BDS and ICAP ***at any time***," including making certain types of accounts ineligible:

> If we or NFS determine that your Brokerage Account is no longer eligible or the Program eligibility requirements change, we retain the right to change your Brokerage Account's core account investment vehicle from the BDSP or ICAP to an alternative core account investment vehicle, including a Money Fund made available by us and NFS. A Money Fund will not be FDIC insured.

106. For instance, those who held accounts at Osaic's predecessor Infinex received notification of a change to the Cash Sweep Program after the Osaic acquisition — that most clients will "see their sweep option change from a money market mutual fund to an FDIC-insured bank deposit product." This change became effective on or around February 6, 2023, with those clients automatically enrolled in the Cash Sweep Programs.

[6] Osaic Wealth, Inc., Form ADV Part 2A (Jan. 24, 2025), https://assets.osaic.com/m/2e9b66b68b4df36c/original/Form-ADV-Part-2A.pdf ("Form ADV").

107. The Cash Sweep Documents also acknowledge that circumstances, "***will require*** that we or NFS make certain modifications or changes to the Cash Sweep Program, including changing the core account investment vehicles." And yet, Osaic has not made the material changes required to fulfill its fiduciary duties to its clients.

**b. The Program Banks**

108. Osaic selects and provides a list of participating Program Banks in the Cash Sweep Programs.

109. The Program Bank List is updated from time to time and all changes are "posted to the website listed in Appendix A, along with the date on which the most recent update was made." As the Cash Sweep Program Documents provide, one or more of the Program Banks "may be replaced" or "deleted" or the order of Program Banks on the Program Bank List may change at any time by the Osaic Defendants.

110. As with the AP Cash Sweep Program, a "nondiscretionary" methodology is purportedly used to determine how swept cash is allocated to each Program Bank subject to "deposit capacity limits."

111. The discretion to select, replace, delete or change the order of the Program Banks rests entirely with Osaic, and not the client. The Cash Sweep Documents provide:

> You [the client] cannot change the Program Banks on the applicable Program Bank List, the order in which cash is deposited at the Program Banks on the Program Bank List, or the Maximum Deposit Amount at any Program Bank.

112. Indeed, the clients' relationship with the Program Banks is restricted, as they have no direct account relationship with the Program Banks:

> [Y]ou will not have a direct account relationship with the Program Banks, and you will not be able to instruct the Program Bank to process deposits or withdrawals from your Deposit Account.

**c. Rates of Interest and Fees**

113. Osaic has the sole authority to set the fees and rates of interest. The Cash Sweep Agreements make clear that: "***we [Osaic] determine the rate of interest you receive***

***on your Deposit Accounts***." The Form ADV further provides that: "[t]he interest rate payable to you [the customer] is determined by us [Osaic]."

114. The rate is purportedly set by Osaic's Cash Review Committee, which considers a number of market-based factors:

> Our Cash Review Committee meets periodically to review the interest rates paid to clients in the [Bank Deposit Sweep Program] and determine whether and when the rates will change. Factors considered include the rates paid by Program Banks [to obtain deposits from the Sweep Program], expected changes in interest rates, interest rates paid by market competitors, and program expenses.

115. Osaic also promised in its Cash Sweep Documents that it would periodically adjust interest rates based on economic conditions:

> ***We will periodically adjust interest rates*** and the interest rate tiers based on a number of factors, ***including general economic, market and business conditions***.

Despite its representation to the contrary, Osaic categorically has *not* adjusted interest rates paid to clients based on economic or prevailing market factors, but rather has kept the sweep rates artificially depressed so as to reap substantial profits for itself.

116. Similarly, Osaic had discretion and control over the fees that it is paid by the Program Banks for investing or loaning out Osaic's customers' cash. Osaic reserves the right to "modify the fees" it receives from the Program Banks, including "***reduc[ing] all or a portion of the payment we receive***" or "***waiv[ing] any portion of the fee, or the fee in its entirety***."

117. Due to applicable law, industry standards and the Osaic Defendants' control and discretion over investors' cash sweep holdings and the returns on such holdings, the Osaic Defendants owe a fiduciary and contractual duty to all of their customers with cash in sweep accounts, which includes a duty to act in their best interests, and to place such best interests ahead of their own self-interest. Defendants breached those duties when they swept client cash into Cash Sweep Programs vehicles that paid customers unreasonably low interest rates.

### D. Defendants Breached Their Fiduciary Duties and Contractual Obligations

118. The Osaic Defendants breached and continue to breach their fiduciary duties and contractual obligations by creating and operating the Cash Sweep Programs to enrich themselves at the expense of its customers, while failing to pay reasonable rates of interest on their clients' cash deposits. The Osaic Defendants were required but failed to put their clients' interests ahead of their own in engineering, operating, maintaining, and recommending the Cash Sweep Programs. The Osaic Defendants were also required to pay reasonable rates of interest to their clients — adjusted accordingly based on prevailing market conditions.

119. Prior to the acquisition by Osaic, the interest rates paid by American Portfolios under the AP Cash Sweep Program were as low as 0.01% in 2022—virtually nothing.

120. After the APH acquisition, APA and Osaic Wealth continued to pay their clients paltry rates of interest that were exceedingly lower than market-based indicators. Infinex and its successor-in-interest Osaic Institutions also continued to pay clients the same artificially low rates as Osaic Wealth during the relevant period.

121. Below is a chart of the interest rates paid in Osaic's Bank Deposit Sweep Program as of January 17, 2025, which is based on the amount of assets deposited in accounts custodied by Pershing and NFS:

| Tiers | Deposit Range | Rate |
|---|---|---|
| 1 | $0 – $24,999 | .15% |
| 2 | $25,000 – $49,999 | .15% |
| 3 | $50,000 – $99,999 | .15% |
| 4 | $100,000 – $249,999 | .20% |
| 5 | $250,000 – $499,999 | .30% |
| 6 | $500,000 – $749,999 | .40% |
| 7 | $750,000 – $999,999 | .75% |
| 8 | $1,000,000 – $1,499,999 | 1.00% |
| 9 | $1,500,000 – $4,999,999 | 1.25% |
| 10 | $5,000,000 – MAX | 1.50% |

122. Below is a chart of the interest rates paid in Osaic's Insured Cash Account Program in accounts custodied by Pershing and NFS, respectively:

NFS

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/ fee-based IRAs accounts | .65% | $19.60 |

Pershing

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/fee-based IRAs accounts | 0.60% | $23.30 |

123. As set forth above, for customers with up to $999,999 in assets at Osaic, Osaic was paying as little as 0.15% in interest, and only up to 1.5%.

124. As explained below, the rates paid by Osaic were unreasonable even in a low interest rate environment and were far less rates offered by competing sweep accounts.

125. Moreover, the rates of interest paid to Osaic customers were net of "fees" or the rates of interest paid by the Program Banks to the Osaic Defendants and the Clearing Firms. These "fees" that the Defendants reaped off of their clients' cash were significantly higher than the rate of interest paid to those clients.

126. An interest rate is reasonable if it is based on a fair market valuation. As defined in the Oxford English Dictionary, the term "reasonable" is synonymous with "fair" and "equitable."

127. The U.S. Department of Labor defines a "reasonable" rate of interest as:

> a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.

128. Similarly, the IRS defines an "arm's length interest rate" as "a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances."

129. Thus, under these terms, and any fair interpretation of what a "reasonable" rate of interest is, Defendants have not secured or paid a reasonable rate of interest to their customers, including Plaintiffs and the Class. The Cash Sweep Programs have paid well below the prevailing or market interest rates.

130. Defendants' rates of interest in the Cash Sweep Programs were also below objectives measures of reasonableness, including the leading indicators set forth below. These benchmarks demonstrate that the rates of interest in the Cash Sweep Programs were not fair or reasonable, and did not properly take into account economic and market conditions, despite Osaic's contractual promise that it would do so.

131. As a result, Plaintiffs and the Class suffered damages by receiving far lower interest payments than they would have received if the sweep interest rates were reasonable or fair.

**1. The Federal Funds Rate**

132. The federal funds market consists of domestic unsecured borrowings in U.S. dollars by depository institutions from other depository institutions and certain other entities, primarily government-sponsored enterprises. In other words, the Federal Funds Rate is the interest rate charged by banks to borrow from each other overnight. The effective Federal Funds Rate is calculated as a volume-weighted median of such overnight federal funds transactions (the "Federal Funds Rate").

133. From 2018 to 2019, and again from March 2022 to August 2024, the Federal Reserve began significantly raising the effective federal funds rate.

134. By August 2024, the effective Federal Funds Rate had risen to 5.33%. As the chart below shows, while the Federal Reserve began raising the federal rate beginning in 2018 through 2024—up from 0.08% in February 2022 to 5.33% in August 2024—Defendants kept the interest paid to Osaic cash sweep account holders drastically lower:




135. While the Federal Funds Rate has declined moderately since the summer of 2024, it is still hovering above 4.30%—significantly above the rates of interest paid by Defendants to their clients under the Cash Sweep Programs.

**2. Interest on Short-Term U.S. Treasury Bills**

136. The yield on short-term U.S. Treasury Bills further demonstrates that the rates Osaic paid on the Cash Sweep Programs were unreasonably low. U.S. Treasury Bills ("T-Bills") are short-term securities issued by the U.S. Department of the Treasury with maturities ranging from four to 52 weeks. T-Bills are issued at a discount from the face value, and when they mature, the investor is paid the face value.

137. Treasury Bills are considered safe investments because they are backed by the U.S. government, but generally carry low rates of return. Nevertheless, the yield on the shortest term (one month) U.S. Treasury Bill has steadily increased from close to zero in 2021 to approximately 5.5% in mid-2023. As of December 31, 2024, the one-month treasury rate was set at 4.42% and the three-month rate at 4.31%.

138. By contrast, the interest rate Osaic paid under the Cash Sweep Programs has remained a fraction of the T-Bill rate.

### 3. Money Market Rates, Including Those Offered by Osaic

139. Money market rates are another benchmark for determining a reasonable rate of interest.

140. Money market funds are a type of mutual fund that invests in high-quality, short-term debt instruments and cash equivalents, such as U.S. Treasury Bills.

141. The rate of return for a money market mutual fund is typically shown for a seven-day period, referred to as the "7-day yield," and is typically expressed as an annual percentage rate.

142. Outside of the Cash Sweep Programs, Osaic offered money market mutual funds through accounts custodied at both Pershing and NFS (the "Money Market Funds"). However, the Money Market Funds were only the default product or "available for use as a core account investment vehicle" for a very narrow set of account types not held by many individual investors: ERISA Title I accounts, 403(b)(7) plans, and Keogh Plans.

143. Osaic's Money Market Funds offered significantly higher rates of interest than what it paid to investors under the Cash Sweep Programs. For example, as of February 2025, the Federated Hermes Government Reserves Fund for Osaic accounts custodied at Pershing provided a 7-day yield of 3.43% and the Fidelity Government Cash Reserves Fund for Osaic accounts custodied at NFS provided a yield of 4.19%.

### 4. Other Institutions' Cash Sweep Account Interest Rates

144. The sweep interest rates paid by Osaic's competitors, who offered FDIC-insured sweep accounts similar to those in the Osaic Cash Sweep Programs, demonstrate that the rates offered by Defendants were unreasonably low.

145. For example, as the Federal Reserve raised the Federal Fund Rate, Fidelity Investments and R.W. Baird increased the rates of interest they pay to customers from 2022 to 2024, offering significantly higher rates than Osaic for similar cash sweep programs.

146. As of February 2025, competitor Moomoo Financial Inc.'s rate for cash swept was 4.1%, Webull's rate was 3.75%, Vanguard's rate was 3.65%, Fidelity's rate was

2.19%, and Robert W. Baird's rate is between 1.45% and 2.89%. Osaic is paying as little as 0.15%.

147. As these competitor rates show, other brokerage and advisory financial institutions that have cash sweep programs pay or secure significantly higher interest rates than Osaic.

**5. The Interest Rate Applicable to Short-term Instruments, Such as Repurchase Agreements**

148. A repurchase agreement ("repo") is a short-term secured loan, where one party sells securities to another and agrees to repurchase those securities later at a higher price. In simple terms, a repo is an exchange of a security (which acts as collateral) for cash.

149. Banks, dealers, other financial institutions, and corporate investors commonly use repos to finance their securities inventories, obtain short-term funding, and/or meet regulatory requirements. Typically, high-quality debt securities are used as collateral in a repo, such as government bonds, agency bonds, supranational bonds, corporate bonds, convertible bonds, and emerging market bonds.

150. The U.S. overnight repo rate, set by the Federal Reserve, represents the interest rate at which different market participants swap treasuries for cash to cover short-term cash needs. From April of 2023 through April of 2024, the overnight repo rate in the United States ranged from approximately 4.83% in April 2023 to high of 5.55% in December 2023. As of January 8, 2025, the U.S. overnight repo rate was 4.25% which is significantly above the interest rate paid by Defendants to account holders in the Cash Sweep Programs.

**E. The Cash Sweep Programs Unfairly Benefit the Defendants**

151. The Osaic Defendants have intentionally structured the Cash Sweep Programs with the Program Banks for their own financial benefits, to the detriment of Osaic's clients, by keeping the interest rates for their cash sweep accounts artificially low,

while earning higher interest rates on those deposits in the form of "fees" paid by the Program Banks.

152. First, the Program Banks benefit from the "significant amount of cash" the Osaic Defendants make available to them through the Cash Sweep Program, which is "***generally in the billions of dollars***." This massive cash in-flow provides the Program Banks with a "relatively stable source of deposits." Program Banks in turn use the deposited cash for their investment or lending activities, thus driving substantial revenue for the Program Banks.

153. Second, the Osaic Defendants profit from the "spread," a significant portion of which they continue to keep for themselves, at the expense of their customers, as "fees" charged for the Cash Sweep Programs. Osaic, NFS, Pershing, the Program Banks, and the third-party administrator all share in the "fees" and generate "significant income." This income in the form of "fees" is paid by the Program Banks to the Osaic Defendants.

154. In "almost all circumstances," the fees that Osaic receives from the Program Banks is "substantially greater" than the portion of fees that the Clearing Firms and third-party administrator receive. These fees are "***net of," and reduce the interest paid on customers' cash balances*** in the Cash Sweep Program. In addition, any Program Banks that are affiliated with Osaic will receive financial benefits under the Cash Sweep Programs "in the form of additional 'spread' revenue."

155. As Osaic acknowledges in its Form ADV, "[b]ecause the Sweep Program generates significant payments from third parties (*i.e.*, the Program Banks that participate in BDSP and/or ICAP) to [Osaic's affiliated broker-dealers], a conflict of interest exists." And yet despite the clear conflict of interest and their legal obligations to mitigate such conflicts, the Osaic Defendants made no efforts to do so.

156. The conflict of interest is exemplified by the significant profits the Osaic Defendants are able to generate from the Cash Sweep Programs in comparison to other types of products. While the Osaic Defendants profit from "fees" paid by the Program Banks under the Cash Sweep Programs, they do not receive any fees from the Money

Market Funds. Indeed, as Osaic acknowledges in the Pershing Cash Sweep Document, "***[a]s a result of the fees and benefits described above, the Program is significantly more profitable to us than other available sweep options, if any***." This helps explain why Osaic accountholders were automatically enrolled in the Cash Sweep Programs, and not the Money Market Funds or other higher interest-bearing products.

157. A conflict of interest further arises for advisory accounts, because Osaic "earn[s] more compensation from cash balances being swept to or maintained in the Sweep Program than if you purchase other investment funds or securities." *See* Form ADV at 27. As to Advisory IRA Accounts and other investment advisory accounts, Osaic earned two layers of fees on the same cash balances: compensation from the Cash Sweep Programs ***and*** advisory fees paid to Osaic's affiliated investment adviser. Unfortunately, this incentivizes the Osaic Defendants to keep their clients' cash idle, because they make more money through the Cash Sweep Programs than fulfilling their fiduciary duties to invest that cash in the markets on behalf of their clients.

158. Osaic has thus established a practice whereby ***Osaic makes significant profits on its client cash balances whereas the client***, to whom a fiduciary duty or duty to act in the client's best interest is owed, ***loses money*** on his or her cash balances compared to other instruments of comparable risk, because the interest the client earns in his cash sweep account is less than the fees Osaic collects.

159. The "fees" that Defendants collect under the Cash Sweep Programs are, in effect, profits shared by the Program Banks. While the structure of the "fees" varies based on the type of Cash Sweep Program, the end result is the same: Defendants profit from the difference in rates of interest, at the expense of their customers. Defendants also receive additional compensation from "Priority Banks," *i.e.*, Program Banks placed ahead of other Program Banks, because they have "agreed to pay additional compensation to [Osaic] to receive preferential ordering in the allocation sequence."

### 1. Defendants' Fees Under the Bank Deposit Sweep Program

160. For the Bank Deposit Sweep Program, the fee that Defendants receive is based on the "spread" or the difference between the interest paid out to the Osaic clients and the rate earned by the Program Banks on their investment activities (the "BDSP Fee"). This spread is also known as net interest income. The Cash Sweep Program Documents provide:

> The Program Banks thus have an incentive to pay a rate for Program Deposits that is higher than the rate received by you, and the ***difference is the fee we [Osaic] and NFS collect for administering the Sweep Program and related services***.
>
> * * *
>
> For the BDSP, ***the difference between the rate paid*** by a Program Bank and the rate you receive as interest ***is the total fee that we, Pershing, and the third-party administrator collect for administering the BDSP and related services***.

161. Defendants' BDSP Fee is paid by the Program Banks for "provid[ing] . . . a significant source of steady deposits." The payment is "equal to a percentage of ***all*** participants' average daily deposits at all Program Banks."

162. Because Defendants received the difference between the interest rate paid to the client and the rate secured by the Program Banks, they continue to align themselves with the Program Banks, rather than the customers to which they owe fiduciary duties. The greater the difference between the interest secured by the Program Banks and interest paid to the Osaic clients, the greater the profit for the Osaic Defendants.

163. Indeed, the interest rate that Osaic earned as its "BDSP Fee" on its clients' cash was, at all relevant times, ***significantly above*** the rates of interest paid out to those clients:

Pershing:

| Year | Quarter | BDSP Fee* |
|---|---|---|
| 2024 | Q3 | 4.33% |
| | Q2 | 3.65% |
| | Q1 | 3.65% |
| 2023 | Q4 | 3.44% |
| | Q3 | 3.59% |
| | Q2 | 3.35% |
| | Q1 | 3.03% |
| 2022 | Q4 | 1.44% |
| | Q3 | 1.28% |
| | Q2 | 0.48% |
| | Q1 | 0.29% |

NFS:

| Year | Quarter | BDSP Fee* |
|---|---|---|
| 2024 | Q3 | 3.87% |
| | Q2 | 4.19% |
| | Q1 | 4.27% |
| 2023 | Q4 | 4.08% |
| | Q3 | 4.17% |
| | Q2 | 3.95% |
| | Q1 | 3.36% |
| 2022 | Q4 | 1.85% |
| | Q3 | 1.79% |
| | Q2 | 0.59% |
| | Q1 | 0.18% |

164. To put this in perspective, customers who deposited their cash under the Cash Sweep Program received only 0.15% to 0.75% in interest for assets below one million as November 25, 2024. By contrast, Defendants received a BDSP Fee equal to a rate of interest of 4.33% in the third quarter of 2024—***five to 21 times the rate paid to their customers***.

165. Osaic Defendants knew that their customers in the Cash Sweep Program received artificially depressed rates of interest, as low as 0.15%, and yet, purposefully designed the Cash Sweep Programs to maximize the returns they received, at the expense of their clients.

166. For instance, Osaic Defendants set the maximum rate of interest they could receive as their BDSP Fee as high as 600 basis points or 6.00% per year (the Maximum

Fee). This is flatly unreasonable when judged against the *de minimis* rates of interest Osaic paid to its clients.

**2. Defendants' Fees Under the AP Cash Sweep Program and Insured Cash Account Program**

167. Osaic Defendants have structured the fees they received under the Insured Cash Account Program functionally the same as those previously generated by American Portfolios under the AP Cash Sweep Program. Both American Portfolios and its successor-in-interest Osaic Defendants received or receive "monthly per account fees" from the Program Banks for administering the programs.

168. Under the AP Cash Sweep Program, APFS was "paid a maximum monthly per account fee of $22.50 for its services in connection with maintaining and administering the program." This fee was "paid to APFS by the Participating Banks" (the "AP Fee").

169. Under the Insured Cash Account Program, Defendants charge a "monthly fee for each Advisory IRA Account that participates in the ICAP" ("the ICAP Fee.") The monthly fee is a fixed dollar amount that "does not vary by the actual amount of cash in a particular account," thereby creating a conflict of interest between "clients with larger cash balances and clients with smaller cash balances." In contrast to AP Cash Sweep Program, Osaic never capped their per account fee at a maximum amount, allowing it to earn unlimited interest based on the Federal Fund Rate.

170. Despite Osaic and American Portfolios' attempts to characterize these fees as a monthly fixed amount, in reality, Defendants are paid a market rate of interest by the Program Banks, as with BDSP. The amount of the ICAP Fee paid by the Program Banks is "determined based on a fee schedule indexed to the Federal Fund Target Rate" ("FFT"). The formula for the AP Fee was similarly "based on the Federal Funds Target (FFT) Rate" and paid by the Participating Banks:

| FFT Rate (basis points) | Monthly Per Account Fee |
|---|---|
| 0 to 25 | $8.55 |
| 25 to 50 | $9.00 |
| 50 to 75 | $9.60 |
| 75 to 100 | $10.20 |
| 100 to 125 | $10.85 |
| 125 to 150 | $11.55 |
| 150 to 175 | $12.20 |
| 175 to 200 | $12.75 |
| 200 to 225 | $13.30 |
| 225 to 250 | $14.00 |
| 250 to 275 | $14.70 |
| 275 to 300 | $15.40 |
| 300 to 325 | $16.10 |
| 325 to 350 | $16.80 |
| 350 to 375 | $17.50 |
| 375 to 400 | $18.20 |
| 400 to 425 | $18.90 |
| 425 to 450 | $19.60 |
| 450 to 475 | $20.25 |
| 475 to 500 | $20.75 |
| 500 to 525 | $21.25 |
| 525 to 550 | $21.75 |
| 550 to 575 | $22.50 |
| 575 to 600 | $23.75 |
| 600 + | $25.00 |

171. As the Federal Fund Target Rate increases, the monthly fee and the compensation that the Osaic Defendants receive also increase. Thus, the Osaic Defendants profit from the spread or difference between the Federal Fund Target Rate and the interest rate paid to clients.

172. The current Osaic monthly per account fee schedule based on the FFT rate is as follows:

| Example 1 |
|---|
| Federal Funds Target Rate range = 150 - 175 basis points |
| Midpoint of range is 162.50 basis points > round up to nearest whole number = 163 basis points |
| Monthly per account fee = $1 + ($0.052255 x 163) = $9.52 |
| **Example 2** |
| Federal Funds Target Rate range = 450 - 475 basis points |
| Midpoint of range is 462.50 basis points > round up to nearest whole number = 463 basis points |
| Monthly per account fee = $1 + ($0.052255 x 463) = $25.19 |
| Since $25.19 is greater than the stated maximum monthly fee of $22.50, the actual fee would be $22.50 |

173. As of February 2025, the ICAP monthly per account fee that Osaic receive and the rate of interest they paid their clients are as follows:

NFS:

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/ fee-based IRAs accounts | .65% | $19.60 |

Pershing:

| Eligible Accounts | Rate | Monthly Per Account |
|---|---|---|
| Investment Advisory/fee-based IRAs accounts | 0.45% | $23.30 |

174. Startlingly, while the ICAP Fee and AP Fees are pegged to the Federal Fund Target Rate, ***the rate of interest paid to Osaic accountholders was and still is at all relevant times, substantially less than the Federal Fund Target Rate.***

175. Indeed, as indicated above, the rates of interest paid to clients under the Insured Cash Program have no correlation whatsoever to the Federal Fund Target Rate. For example, ICAP clients received a rate of interest of 0.45% to 0.65%, while the Osaic Defendants earned a rate of interest as high as 4.25% to 4.50% (in the form of a $20-$23 fee). In comparison to the *de minimis* rates of interest that Osaic clients are paid, the monthly flat fees Osaic receives — based on a significantly higher rate of interest — are unreasonably high.

176. Defendants continue to set the ICAP Fee to the FFT rate, because they know they can receive significantly higher profits from the Program Banks tied to prevailing market rates, especially when the rates of interest paid to the Osaic customers are artificially depressed. Consequently, the "monthly fixed fee," is significantly "offset" by the "total amounts paid to [Osaic] by the Program Banks," in connection with ICAP as well as BDSP. Moreover, if whatever reason the [ICAP] fee was not "sufficient," Osaic "***reserve[d] the right to debit your Advisory IRA Account for the amount of any shortfall*** [to the Program Banks]."

177. Thus, the AP Cash Sweep Program, as well as ICAP, together with BDSP, were purposefully engineered to ensure Defendants' profit, at the expense of their

customers. Defendants continue to orchestrate the ICAP Program to maximize their overall return, rather than the accountholders to which they owe fiduciary duties. By extracting excessive rates of interest (disguised as fees) for themselves and not sharing any of those fees to which the customers were entitled, Defendants breached and continue to breach their fiduciary duties and contractual obligations.

### 3. Osaic Reaps Substantial Profits at the Expense of its Customers

178. Rather than act as a fiduciary in the best interests of its clients, Osaic operated the Cash Sweep Programs as a profit center, using the Program Fees to derive a meaningful source of revenue for Defendants, at the direct cost to Osaic customers. As the Cash Sweep Program documents acknowledge, "***[t]he income we [Osaic] earn from Program Banks based on your balances in BDSP and ICAP will in almost all circumstances be substantially greater than the amount of interest you earn from the same balances***."

179. The Osaic Defendants earn interest that is similar or even above the prevailing or market rates, while Osaic customers earn a tiny fraction of that interest. The Clearing Firms "earn interest, or a return, based on short-term market interest rates prevailing at the time," and then "share[] a portion of this compensation with [Osaic]." However, the Osaic Defendants earn even greater returns as they receive "***a substantially greater . . . portion of the Program Fees***" than those paid the Clearing Firms or other service providers. As a result, the Osaic Defendants receive a "substantially higher percentage of the interest" than the interest credited to customer accounts.

180. At relevant times, the Cash Sweep Programs generate a significant amount of the Company's overall profits. As a result, Osaic became particularly dependent on paying customers low rates of interest in the Cash Sweep Programs and extracting higher rates for itself—more so than other financial institutions with more diverse revenue streams. As *Moody's* identified in article published on August 20, 2024, private-equity backed financial companies, such as Osaic, have a greater reliance on high-margin cash

sweep revenue to help pay down their debt due to "less diverse revenue streams and aggressive financial policies."

181. The significant benefits Defendants received from the setting of cash sweep interest rates on cash sweep accounts are reflected in Osaic's net interest income and EBITDA growth from 2019 to present.

182. In November 2023, Osaic posted an EBITDA—earnings before interest, taxes, depreciation and amortization—margin of 14.6% as of midyear on a trailing 12-month basis, which was significantly higher than its average EBITDA margin of 11% from 2019 to 2022. As *InvestmentNews* observed, the substantial boost in Osaic's EBITDA is at least partially attributable to net income interest growth:

> Osaic's net interest income – NII – on cash balances held in sweep accounts improved year-over-year due to the higher rate environment, which has partially offset lower commission-based revenues and revenues linked to market performance," according to the Fitch report from October.

183. According to *InvestmentNews*, the rising EBITDA margin—due at least in part to the Cash Sweep Programs—"demonstrates that Osaic, which many in the market believe will seek to go public in the next few years, is moving its cash flow in the right direction."

184. As these record profits and analyst commentary show, Defendants were financially incentivized to maintain the artificially low interest rates on sweep accounts to keep the spread as high as possible, thwarting Plaintiffs and the Class from receiving a reasonable rate of interest.

## V. CLASS ACTION ALLEGATIONS

185. Plaintiffs reallege and incorporate by reference the allegations set forth in ¶¶1-184 above. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3), on behalf of:

**The Class**:

All persons or entities who held cash positions, including deposits or balances in the Cash Sweep Programs, from February 3, 2019 until the unlawful conduct alleged herein ceases.

186. Excluded from the Class are Defendants, including any of their affiliates, officers and directors, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Defendants have or had a controlling interest.

187. Plaintiffs reserve the right to amend the Class definition upon conducting further investigation or discovery.

188. The members of the Class are so numerous that joinder of all members is impracticable and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

189. Defendants have thousands of customers nationwide and oversee more than $500 billion in client assets through thousands of financial advisors. The Class thus satisfies the numerosity requirement of Rule 23.

190. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail or electronically. Defendants regularly communicate with the Class by mail and/or electronically.

191. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which may also be certified under Rule 23(c)(4), include the following:

(a) Whether Defendants owed fiduciary duties to Plaintiffs and the other Class members, as alleged herein;

(b) Whether Defendants breached their fiduciary duties to Plaintiffs and the other Class members, as alleged herein;

(c) Whether Defendants breached the contractual terms of their account agreements and other written communications to Class members;

(d) Whether Defendants breached the implied covenant of good faith and fair dealing;

(e) Whether the interest rates paid to Class members under the Cash Sweep Programs were fair and reasonable;

(f) Whether Defendants were unjustly enriched by their wrongful conduct;

(g) Whether Defendants committed gross negligence;

(h) Whether this case may be maintained as a class action under Federal Rule of Civil Procedure 23;

(i) Whether and to what extent Plaintiffs and the other Class members have sustained damages and the proper measure of damages; and

(j) Whether and to what extent Plaintiffs and the other Class members are entitled to attorneys' fees and costs.

192. Plaintiffs' claims are typical of the other Class members' claims because Plaintiffs and the Class sustained damages as a result of Defendants' wrongful conduct since Plaintiffs were or are customers of Defendants and had his cash balances improperly managed by Defendants through their administration of the Cash Sweep Program. Thus, Plaintiffs' claims are typical of the claims of the other Class members, because all Class members are similarly affected by Defendants' wrongful conduct, and the relief Plaintiffs seek for the Class is common to all Class members.

193. Plaintiffs will fairly and adequately protect the interests of other Class members. Plaintiffs have retained counsel competent and experienced in complex class action litigation. Plaintiffs have no interests adverse or antagonistic to those of the Class.

194. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

195. Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

(a) the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

(b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or may substantially impair or impede their ability to protect their interests; and/or

(c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI. CLAIMS ALLEGED

### FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty
### (Against All Defendants)

196. Plaintiffs repeat and incorporate by reference ¶¶1-195, as if fully set forth herein.

197. At all relevant times, the Osaic Defendants owed fiduciary duties to Plaintiffs and the other Class members with respect to the Cash Sweep Programs.

198. As fiduciaries, the Osaic Defendants owed Plaintiffs and the other Class members a duty of loyalty, a duty of care, and good faith, as well as a duty to act in the

Plaintiffs and other Class members' best interest and not put the Osaic Defendants' interests ahead of Plaintiffs and the Class.

199. Defendants breached their fiduciary duties by the conduct alleged herein, including by: (i) designing, structuring, maintaining, and/or operating the Cash Sweep Programs to benefit themselves at the expense of Plaintiff and the Class; (ii) failing to pay or secure for Plaintiffs and the Class a reasonable rate of interest; and (iii) recommending to Plaintiffs and the Proposed Class that they continue to utilize the Cash Sweep Programs.

200. The Osaic Defendants' past, continuous, and ongoing breaches of fiduciary duties damaged Plaintiffs and the Class.

201. Defendant Osaic, Inc. knowingly encouraged, directed, and participated in Osaic Institutions', Osaic Wealth's, and APA's breaches of fiduciary duties and knowingly received the benefits thereof, and Osaic, Inc., Osaic Institutions, Osaic Wealth, and APA are therefore jointly and severally liable therefor.

202. Osaic, Inc. is also liable for such breaches, including under the doctrine of respondeat superior, because Osaic Institutions and Osaic Wealth are wholly owned subsidiaries and agents of Osaic, Inc. and committed breaches of contracts within the scope of its corporate principal-agent relationship.

203. As a direct and proximate consequence of the Osaic Defendants' conduct as alleged herein, Plaintiffs and the other Class members suffered damages in an amount to be determined at trial and seek disgorgement of any undue and unjust gains of the Osaic Defendants, punitive damages, as well as all other equitable relief deemed just and proper.

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(Against All Defendants)**

204. Plaintiffs repeat and incorporate by reference ¶¶1-195, as if fully set forth herein.

205. The Osaic Defendants' governing documents related to the Cash Sweep Programs, including their Form CRS, constitute a binding agreement between Osaic and its accountholders.

206. The governing documents require the Osaic Defendants to act in a client's "best interest" and "not place [the Osaic Defendants'] interests ahead of [Plaintiffs and the Class]."

207. The governing documents also require that the Osaic Defendants periodically review and adjust interest rates paid to Plaintiffs and the Class under the Cash Sweep Programs based on economic and market conditions.

208. As set forth herein, the Osaic Defendants (i) failed to place their clients' interests ahead of their own by creating, structuring, operating and maintaining the Cash Sweep Programs for their own benefit and to the detriment of their clients; and (ii) failed to pay Plaintiffs and the Class interest rates on their Cash Sweep Program holdings that accounted for economic and market conditions. Therefore, the Osaic Defendants breached the contracts.

209. The Osaic Defendants' past, continuous, and ongoing breach damaged and continues to damage Plaintiffs and the Class.

210. Defendant Osaic, Inc. knowingly encouraged, directed, and participated in Osaic Institutions', Osaic Wealth's, and APA's breaches of contracts and knowingly received the benefits thereof, and Osaic, Inc., Osaic Institutions, Osaic Wealth, and APA are therefore jointly and severally liable therefor.

211. Osaic, Inc. is also liable for such breaches of contracts, including under the doctrine of respondeat superior, because Osaic Institutions and Osaic Wealth are wholly owned subsidiaries and agents of Osaic, Inc. and committed breaches of contracts within the scope of its corporate principal-agent relationship.

## THIRD CAUSE OF ACTION
## Breach of the Implied Covenant of Good Faith and Fair Dealing
## (Against Defendants APA, Osaic Wealth, and Osaic Institutions)

212. Plaintiffs repeat and incorporate by reference ¶¶1-195, as if fully set forth herein.

213. The governing documents related to the Cash Sweep Programs, including their Form CRS, constitute a binding agreement between Defendants APA, Osaic Wealth, and Osaic Institutions and their accountholders.

214. Implicit in these contracts (the purpose of which was to earn interest on clients' uninvested cash in their accounts), and under New York and Connecticut law, is a covenant of good faith and fair dealing, requiring Defendants APA, Osaic Wealth, and Osaic Institutions to deal fairly with their clients, to fulfill their obligations under the contract in good faith, and to not deprive Class members of the fruits of their bargain. The contracts created the reasonable expectation that: interest rates paid on cash deposits in the Cash Sweep Programs would vary based upon prevailing market or business conditions; Defendants APA, Osaic Wealth, and Osaic Institutions would meaningfully increase the interest rates paid as the market improved and interest rates rose generally; and Defendants APA, Osaic Wealth, and Osaic Institutions would use their leverage and bargaining power to obtain higher interest rates for their clients in the Cash Sweep Programs than the artificially low rates that were paid.

215. Through the implied covenant of good faith and fair dealing, Defendants APA, Osaic Wealth, and Osaic Institutions were obligated to: pay to or secure a fair and reasonable rate of interest on customers' cash deposits in the Cash Sweep Programs; and to properly account for, pay, adjust, or reconsider rates of interest considering current or prevailing economic, market, and business conditions and competitive interest rates on customers' cash deposits in the Cash Sweep Programs.

216. By failing to do so, and by paying and setting cash sweep interest rates for clients that were arbitrary, unreasonable, or unfairly low, and by exercising their discretion in a manner that frustrated the provisions of the contract and ran contrary to customers' reasonable expectations of the benefits they would receive from the Cash Sweep Program Documents, Defendants APA, Osaic Wealth, and Osaic Institutions breached the implied covenant of good faith and fair dealing.

217. As a direct and proximate result of Defendants APA, Osaic Wealth, and Osaic Institutions' past, continuous, and ongoing breaches of the implied covenant of good faith and fair dealing, Plaintiffs and the Class sustained and continue to sustain damages.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(Against Defendants APA, Osaic Wealth, and Osaic Institutions)**

218. Plaintiffs repeat and incorporate by reference ¶¶1-195, as if fully set forth herein.

219. Defendants APA, Osaic Wealth, and Osaic Institutions engaged in the wrongful conduct of: (i) sweeping available cash balances from customer accounts into accounts at Program Banks that provided customers with inappropriately low interest rates, (ii) prioritizing their own financial gains over their clients by paying clients unreasonably low rates of interest Plaintiffs; and (iii) ignoring their obligations to account for, adjust or reconsider interest rates based on prevailing market and economic conditions in order to pad their own pockets.

220. Through their wrongful conduct, Defendants APA, Osaic Wealth, and Osaic Institutions received, accepted and retained net interest income, fees, and other non-gratuitous benefits conferred by Plaintiffs and the Class. In particular, Defendants APA, Osaic Wealth, and Osaic Institutions earned hundreds of millions of dollars on their clients' cash by investing or loaning out that cash to third parties, while paying their clients only *de minimis* rates of interest.

221. As a result, Defendants APA, Osaic Wealth, and Osaic Institutions were unjustly enriched by their misconduct, because they received a significantly greater profit or net interest income than they would have, but for their wrongful conduct. Defendants APA, Osaic Wealth, and Osaic Institutions retained these financial benefits at the expense of and to the detriment of Plaintiffs and the Class.

222. Under principles of equity and good conscience, Defendants APA, Osaic Wealth, and Osaic Institutions should not be permitted to retain the disproportionate

amount of interest and fees they earned on their customers' cash deposits in the Cash Sweep Programs at their clients' expense. Defendants APA, Osaic Wealth, and Osaic Institutions have received, and are holding funds belonging to Plaintiffs and the Class, which in equity Defendants should not be permitted to keep but should be required to refund to Plaintiffs and the Class. The result is particularly inequitable and unjust in the following scenarios: (1) negative overall return situations, where Defendants APA, Osaic Wealth, and Osaic Institutions charged their clients more in fees than what they paid out in interest on swept cash, such that their clients lost money in the Cash Sweep Programs; and (2) surplus interest situations, where APFS (now known as Osaic Wealth) retained excess administration fees and surplus interest, which should have been paid to customers.[7]

223. Plaintiffs and the other Class members suffered and continue to suffer financial harm from Defendants APA, Osaic Wealth, and Osaic Institutions' misconduct and are entitled to damages, including the restitution and disgorgement of the profits and other financial benefits unjustly obtained by Defendants APA, Osaic Wealth, and Osaic Institutions.

---

[7] *See* American Portfolios Financial Services, Inc. Letter of Acceptance, Waiver, and Consent ("FINRA Consent Order") finding:

> APFS retained surplus interest when, due to interest rate changes that occurred after the firm had determined customer yields, the total interest paid by participating banks in the Sweep Program was greater than the combination of fees retained by the firm, other administration fees, and interest paid to customers . . .
>
> From April 2018 through September 2022 . . . APFS retained excess administration fees and surplus interest, which it should have paid to customers. On its general ledger, however, APFS credited these amounts as revenue when it should have debited the amounts as payable to customers.

(ECF 43 Ex. A at 9-10).

**FIFTH CAUSE OF ACTION**
**Violation of the Investment Advisers Act of 1940**
**(Against All Defendants)**

224. Plaintiffs repeat and incorporate by reference ¶¶1-195, as if fully set forth herein.

225. APA was registered as an investment adviser under the Advisers Act. Osaic owns and controls APA. Osaic Wealth is a registered investment adviser under the Advisers Act. Osaic owns and controls Osaic Wealth.

226. For the reasons alleged herein, APA and Osaic Wealth violated §206 of the Advisers Act in connection with their operations of the Cash Sweep Programs by failing to serve the best interests of their clients, by placing their own interests ahead of the interests of its clients, and by failing to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act. *See* 15 U.S.C. §80b-6; Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment Advisers Act Release No. 5248, 84 Fed. Reg. 33669 (July 12, 2019).

227. The Account Agreement should be deemed void pursuant to §215(b) of the Advisers Act. *See* 15 U.S.C. §80b-15.

228. Accordingly, Plaintiffs and the Class seek rescission of the Account Agreements and restitution of the consideration given pursuant to its purported terms.

## VII. REQUEST FOR RELIEF

Plaintiffs, individually and on behalf of the other Class members, requests relief as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B. Ordering Defendants to pay actual damages (including punitive damages) and restitution to Plaintiffs and the other Class members, as allowable by law;

C. Ordering disgorgement of profits obtained by Defendants as a result of

Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D. Ordering injunctive relief prohibiting Defendants from continuing to engage in the conduct alleged herein;

E. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded;

F. Ordering Defendants to pay attorneys' fees and costs of suit; and

G. Ordering such other and further relief as may be just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all claims so triable.

DATED: February 16, 2026.

*s/* Thomas A. Gilson
THOMAS A. GILSON

Thomas A. Gilson
**ROSE LAW GROUP PC**
7144 E. Stetson Drive, Suite 300
Scottsdale, Arizona 85251
Tel.: (480) 505-3934
tgilson@roseawgroup.com

*Local Counsel for Plaintiffs and the Proposed Class*

Adam J. Levitt (Bar No. 5126602)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Tel: (312) 214-7900
alevitt@dicellolevitt.com

Alexander E. Barnett*
Jarett N. Sena*
**DICELLO LEVITT LLP**
485 Lexington Avenue, Suite 1001
New York, New York 10017
Tel.: (646) 933-1000
abarnett@dicellolevitt.com
jsena@dicellolevitt.com

Brian O. O'Mara*
Steven M. Jodlowski*
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, California 92121
Tel.: (619) 923-3939
briano@dicellolevitt.com
stevej@dicellolevitt.com

Kim D. Stephens, P.S.*
Jason T. Dennett*
**TOUSLEY BRAIN STEPHENS PLLC**
1200 5th Avenue, Suite 1700
Seattle, Washington 98101
Tel.: (206) 682-5600
kstephens@tousley.com
jdennett@tousley.com

Aaron Morris*
Andrew Robertson*
**MORRIS KANDINOV LLP**
305 Broadway, 7th Floor
New York, New York 10007
Tel.: (332) 240-4024
aaron@moka.law
andrew@moka.law

Jonathan R. Chally*
Stephen D. Councill*
Joshua P. Gunnemann*
**COUNCILL, GUNNEMANN & CHALLY, LLC**
75 14th Street, NE, Suite 2475
Atlanta, Georgia 30309
Tel.: (404) 407-5250
jchally@cgc-law.com
scouncill@cgc-law.com
jgunnemann@cgc-law.com

*Counsel for Plaintiffs and the Proposed Class*

*admitted *pro hac vice*